[No. 1378.]

T. J. EDWARDS AND J. M. WRIGHT, EXECUTORS OF THE ESTATE OF S. C. WRIGHT, DECEASED, APPELLANTS, *v.* THE CARSON WATER COMPANY, A CORPORATION, RESPONDENT.

CORPORATIONS—CONTRACTS OF OFFICERS—WHEN NOT RESPONSIBLE FOR.—A corporation cannot be held responsible for a contract of its officers, or agents, unless it affirmatively appears that such officers or agents were authorized to make the contract, or that the corporation received the benefits derived from the contract.

IDEM—EVIDENCE OF POWERS OF OFFICERS.—Evidence reviewed and held to indicate that respondent did not, by its course of dealing, hold out its officers as possessing the power to make contracts for it without express authority to do so.

IDEM—IMPLIED POWERS—AUTHORITY OF OFFICERS.—When the powers of a corporation to borrow money and to execute and put into circulation its negotiable paper are only implied and incidental, such powers are not to be lightly inferred as existing in its officers, nor are such officers justified in exceeding their instructions from the board of trustees, or those contained in the by-laws.

IDEM—EVIDENCE—UNAUTHORIZED NOTE—FAILURE OF CONSIDERATION. Evidence reviewed and held that the note in suit does not bind re-

spondent because it was executed without authority from respondent's board of trustees, and also because it was executed without any consideration being received by respondent.

IDEM—EXECUTION OF NOTE—AGENCY.—Evidence reviewed and held that the note in suit, purporting to be respondent's note, was given and received to secure a personal debt of respondent's president for money intrusted to him by respondent with which to discharge its debts and which he retained with the knowledge and consent of the payee of the note and without the knowledge or consent of respondent. Further held, that under such circumstances, respondent's president did not act as an agent but for himself and that respondent is not bound by his acts or chargeable with his knowledge.

IDEM—AUTHORITY OF OFFICERS TO RENEW A NOTE.—When affirmative authority from the board of trustees of a corporation is necessary to authorize its officers to execute its promissory note, the same character of authority is required to enable them to legally renew such note.

IDEM—TRUSTEES—UNAUTHORIZED EXECUTION OF NOTE UNDER MISAPPREHENSION OF FACTS—RATIFICATION.—When two of the three trustees of a corporation sign an unauthorized note without the knowledge or consent of the third, and one of them signs under a misapprehension of the facts, the note being for the individual benefit of one of the signers and not for that of the corporation, the property of the third trustee will not be bound by such note, unless, after full information of all of the material facts and an opportunity to act, he ratified the acts of the other two.

RATIFICATION—UNAUTHORIZED NOTE.—Evidence reviewed and held to be insufficient to establish ratification, either express or implied, by respondent of the unauthorized execution of the note in suit.

IDEM—KNOWLEDGE NECESSARY TO RAISE PRESUMPTION OF.—To constitute ratification, by either an individual or a corporation of the unauthorized acts of agents, every detail of the transaction must be made known to the principal. Statements rendered by the secretary of a corporation, showing only its indebtedness in gross, do not impart such information of a particular item of the indebtedness as will raise the presumption that the corporation, by its silence and acquiescence, ratified the unauthorized acts of its officers in incurring such item of debt.

PRACTICE—GRANTING OR REFUSING NEW TRIAL—SOUND DISCRETION OF TRIAL JUDGE NOT DISTURBED BY APPELLATE COURTS.—The granting or the refusal of a motion for a new trial on the ground that the evidence does not support the findings rests in the sound discretion of the trial judge, and such order will not be disturbed by appellate courts when based upon conflicting evidence, and made in the exercise of a sound discretion.

(Bigelow, J., dissenting.)

APPEAL from the District Court of the State of Nevada, Ormsby county.

*Richard Rising,* District Judge.

The action was begun by S. C. Wright, but upon his death his executors were substituted as parties plaintiff. The other facts sufficiently appear in the opinion.

*Rives & Judge,* for Appellants.

I.  The note sued upon was executed by the president and the secretary of respondent, as had been the custom of respondent, commencing with the note of 1875. The president and the secretary were not only officers of respondent but were also members of and constituted a majority of respondent's board of trustees. Under such circumstances appellant's testator had the right to assume that respondent's president and secretary were acting within the scope of their authority when they executed the note. (*Credit Co. Limited* v. *How. Machine Co.,* 54 Conn. 357; *Fidelity Co.* v. *Shenandoah V. R. Co.,* 32 W. Va. 244; Beach on Private Corporations, Sec. 186.)

II.  Respondent having had the use of the money represented by the note since 1875, and having had the benefit of the acts of its officers in postponing the time of payment by renewal of the note, cannot now complain of the acts of its officers respecting the note. (*Dexter, Horton & Co.* v. *Long,* 2 Wash. 439.)

III.  Even though the act of respondent's president and secretary in executing and delivering the note, without a resolution of the board of trustees, was in excess of their authority, yet the evidence proves ratification of their act by respondent. The monthly payment of interest on the note by respondent without objection constituted a complete ratification. (Daniel on Nego. Insts. Vol. I, Sec. 317; Beach on Private Corporations, Vol. I, Secs. 196, 202, 205; Morawetz on Private Corporations, Secs. 78, 79, 252.)

IV.  The note, in renewal of which the one sued upon was given, was not barred by the statute of limitations at the time of the renewal. The interest payments by respondent kept it from outlawing. (Stat. of 1877, p. 114.) The evidence clearly shows the monthly payments of interest by respondent. (Evidence reviewed.)

V.  Respondent under its certificate of incorporation is authorized to purchase property. This authority pre-supposes the power and authority to contract debts when necessary for the purposes of paying for property purchased. Whenever a corporation has the right to contract a debt it may draw a bill

or give a note in payment of it, or borrow money to pay it, and such has been the well established custom of respondent from the time of its incorporation. (1 Parson's Notes and Bills, 164; *Moss* v. *Averill,* 10 N. Y. 449; *Barry* v. *Merchants' Exchange Co.,* 1 Sand. Ch. 280; *Partridge* v. *Badger,* 25 Barb. 146; *Stratton* v. *Allen,* 16 N. J. Eq. 229; *Barnes* v. *Ontario Bank,* 19 N. Y. 152; *Leavitt* v. *Blatchford,* 17 N. Y. 521; *Smith* v. *Eureka Flour Mills,* 6 Cal. 1; *Came* v. *Brigham,* 39 Me. 35; *Com. Bk.* v. *Newport Man. Co.,* 1 B. Mon. 13; 1 Daniel Nego. Instr. 381.)

J. D. *Torreyson,* for Respondent.

I.   Respondent's by-laws do not authorize its president and secretary to execute the corporation's notes.   The note of 1879, of which the note in suit was an attempted renewal, was executed by respondent's president and secretary without authority from or knowledge of respondent.   The note in suit was executed by the president and the secretary of respondent without respondent's authority or knowledge, and was given without consideration, because the note which it attempted to renew had outlawed seventeen months before, which was equivalent in law to payment.

II.   The execution of the note in suit was never authorized by respondent's board of trustees.   Its execution was the unauthorized individual acts of respondent's president and secretary.   The management of respondent's affairs is intrusted to a board of three trustees, whose powers and duties are defined under by-laws.   The trustees have no authority to act except when assembled at a board meeting.   They must meet and act as a board and all must be notified of the meeting or the acts of those meeting will be null and void. (*Edgerly* v. *Emerson,* 23 N. H. 555; *Simon* v. *Sevier Co.,* 14 S. W. Rep. 1101; *Baldwin* v. *Canfield,* 26 Minn. 43; 5 Nev. 224, 229; 6 Nev. 51; Vol. 17 Am. & Eng. Ency. of Law, 83.)

III.   An agent having general authority to manage his principal's business, has by virtue of his employment no implied authority to bind his principal by making, accepting or indorsing negotiable paper. (Mechem on Agency, Sec. 398; *N. Y. Iron Mine* v. *Bank,* 39 Mich. 644.)   A resolution by two directors, in the absence of a third director not sufficiently notified, will not authorize the execution of a mortgage. (*Doyle* v. *Mizner,* 42 Mich. 332.)   To render a note valid signed by an

agent of a corporation the power of the agent must be shown. (*Lawrence* v. *Gebhard*, 41 Barb. 575; *Benedict* v. *Lansing*, 5 Denio, 284; *Dobbins* v. *Etowah Mg. Co.*, 75 Ga. 238.) The secretary has no power to bind the company. (*Bank* v. *Hogan*, 47 Mo. 472; *Gregory* v. *Lamb*, 16 Neb. 205.)

IV. The president and secretary of respondent had no authority to contract debts or make notes in the name of respondent. That power under the charter and by-laws belonged solely to the board of trustees assembled and acting as such. The authority of an officer of a corporation to execute its note depends upon the by-laws, custom or resolution of the board specifying the particular officers to execute the note. (Vol. 1 Beach on Corp. Sec. 187; *Foster* v. *Ohio-Colo. Red. & Mg. Co.*, 17 Fed. Rep. 130.) Persons dealing with corporations are bound to take notice of their constitutions, by-laws and ways of doing business. (*Bocock* v. *Alleghany C. & I.*, 82 Va. 913; *Relfe* v. *Rundle*, 103 U. S. 223; *First Nat. Bank* v. *Gifford*, 47 Iowa 575; *De Bost* v. *Albert Palmer Co.*, 35 Hun. 386; *Alexander* v. *Cauldwell*, 83 N. Y. 480; *Rossiter* v. *Rossiter*, 8 Wend. 494.)

V. The execution of the note being an unauthorized act it could only be ratified by the unanimous consent of the shareholders. (Morawetz on Corporations, Secs. 76, 77.) Ratification to be valid must be with the full knowledge of all of the facts, and the burden of proof and all its essentials rests upon the person asserting it. (Storey on Agency, Sec. 239; Wharton's Agency, Sec. 614; 7 Nev. 76; 4 Cal. 481.) When the adoption of any particular form or mode is necessary to confer the authority in the first instance, there can be no valid ratification except in the same manner. (Wharton on Agency, Secs. 65, 83 and note 7; *Despatch Line* v. *Bellamy*, 12 N. H. 232; *Blood* v. *Goodrich*, 12 Wend. 525; Mechem on Agency, Sec. 136; *McCracken* v. *City of San Francisco*, 16 Cal. 591.)

By the Court, MURPHY, C. J.:

This is an appeal from an order of the district court granting the respondent's motion for a new trial. The action was commenced to recover the sum of two thousand dollars alleged to be due on a promissory note, which is in words and figures as follows:

" $2,000.00.          CARSON CITY, Nev., December 8, 1886.

One day after date we, or either of us, promise to pay to the order of Sam C. Wright two thousand dollars in gold coin of the United States of America, at their office in Carson, for value received, with interest payable monthly in like gold coin at the rate of one and one-fourth per cent. per month from date until paid.     Protest as evidence of presentment and non-payment is hereby waived.

[Signed]          CARSON WATER COMPANY.

By Alfred Helm, Pres. Carson Water Co.

By G. W. Richard, Secy."

We gather from the record the following facts: Some time prior to the incorporation of the Carson Water Company, Alfred Helm and Henry F. Rice purchased the land upon which the company's reservoir is constructed and the water right connected therewith, from W. P. Warren, and gave their promissory note in payment therefor in the sum of two thousand dollars. On the 29th day of December, 1874, the company was incorporated and has been in existence ever since. The affairs of the company are controlled by a board of three trustees. Some time prior to August, 1875, the Warren note becoming due, or Warren wanting his money, Mr. Rice induced Sam C. Wright to take up the note, which he did at a discount of one hundred and fifty dollars. On the 2d day of August, 1875, at a meeting of the board of trustees of said company, the president of the Carson Water Company was empowered and instructed to make, execute and deliver on behalf of the company and as its act and deed, a promissory note to S. C. Wright, at ten days' sight, for the sum of two thousand dollars to retire the note of W. P. Warren. In compliance with said resolution, on the 2d day of August, 1875, the following note was delivered to S. C. Wright:

" $2,000.00.          CARSON CITY, August 2, 1875.

At ten days' sight we promise to pay S. C. Wright or order the sum of two thousand dollars in gold coin of the United States, and interest at the rate of one and one-fourth per cent. per month for value received."

(The signatures have been torn off.)

On the 1st day of July, 1879, the note of " August 2, 1875," not having been paid, a new note was given in figures and words as follows:

"$2,000.00.                    CARSON CITY, July 1, 1879.

One day after date, without grace, we promise to pay to Sam C. Wright, or order, the sum of two thousand dollars, payable only in gold coin of the government of the United States, for value received, with interest thereon in like gold coin at the rate of one and one-half per cent. per month from date until paid.                         T. C. PICKNEY, Secretary."

(Other signature torn off.)

There does not appear to have been any order or resolution of the board of trustees authorizing the making or giving of the above note. In 1881 the Carson Water Company being indebted to a number of parties, borrowed money to pay them off.

The following is the testimony of Alfred Helm, who was then the president of the company, drew the money and was authorized to pay off the indebtedness: "On or about the 10th or 12th or 15th of March—early in March anyway—we borrowed some money in San Francisco to take up some notes of the company outstanding in San Jose, and also to take up this note of Mr. Wright's. I went to San Jose and paid off the notes there and took a check in my own name, I think, to come up here to settle this note up. After I got home—I got home Sunday—and on Monday following I met Mr. Wright and I told him I had the money to take up that note. We went to Wells-Fargo, where he has got a tin box. He went into the vault, got the box and brought it on the counter, opened the box, took out the note, held it in his hand. I said to him that I was in a tight place at that time myself, and I said to him, 'Sam, you don't need this money and I need it awful;' and I said, 'I will give you my third of the water company's stock as security and let me keep this money.' I had three hundred and thirty-three shares and I said, 'Give me this two thousand dollars and you can have the stock,' and he asked me about the stock, and how much there was of it, and finally he said, 'I don't believe I want your stock, but let it run as it stands and you can pay it in a few months, and you can pay the interest and let it be as it is and not make any change.' I objected to it, but he said, 'Let it be as it is.' Afterwards I went to the secretary, Mr. Richard, and told him I used the money represented by the check. I paid my debts with some and bought stock with the rest. I ordered the interest paid at

the office charged to me." This conversation referred to the note of July 1, 1879.

Question by the court: " Was there two thousand dollars due from the company to Mr. Wright at the time of the execution of this note of December, 1886 ?

Answer. No, sir; I suppose it was due from me. But at the same time he met me, and said I must either pay the money— I think he spoke to me a day or two before, and wanted to know if I could pay up the money and I said, ' No,' and he said that note was about run out, and he said he would have to have a new note. He had a note, written by himself, and he told me to sign it as the president of the company, and he asked me to take it to Mr. Richard and get him to sign it, and I think I copied the note. Anyway, that is the way that note was signed— as you see it there.

The shareholders of the company did not know anything about the note of 1886, but I knew about it. There was nothing in the books of the company, that I know of, about the note of 1886 the interest was charged to me every month, and that was done under my instructions." In reply to a question asked Mr. Helm as to how the rate of interest happened to be reduced in the note of 1886 from that charged in the note of 1879, he answered, " I don't recollect just the time it was done, but I went to him and told him that I wanted him to reduce it, because I thought we were paying too much interest. I told him, ' You know that I have to pay that interest myself, and I can't afford it;' and he said to me, ' Let the interest go at one and one-fourth per cent.' That is the way the note of 1886 came to be drawn with interest at the rate of one and one-fourth per cent. I think that was the reason that I rewrote the note that he had written himself, and I changed the rate from one and one-half to one and one-fourth per cent. per month. I had a check of the Carson Water Company in my possession in the month of March, 1881, for the purpose of paying the note then outstanding in the name of Mr. Wright, and for the purpose of paying it to Mr. Wright."

Mr. Wright denied that he ever had any such conversation as testified to by Mr. Helm in relation to the note of 1879. It appears from the books of the company that the interest paid upon the note given in 1879, as well as that paid on the one

given in 1886, was charged to Mr. Helm from May 31, 1881, to and including the month of August, 1889.

Mr. Richard, the secretary, testified to a question asked, "How did the interest come to be charged to Mr. Helm?" and answered: "Mr. Helm said, 'That Wright note is mine, and in paying interest charge it to me.' He said, 'I will protect that note at all hazard.'" Mr. Richard also testified that there was no order of the board of trustees authorizing the renewal of the note of 1879 or 1886 by the president and secretary; that he had never notified the stockholders of the signing of the note of 1886, or that such a note was in existence; that so far as he knew, Helm and himself were the only stockholders that knew of the existence of the note of 1886, and Mr. Helm and himself had never met as a board of trustees to issue the note of 1886. "The circumstances under which I signed the note of 1886—Mr. Helm brought that note to me, saying he wished to take up the other note, and saying that he had secured a reduction in the interest from one and one-half to one and one-fourth per cent. He wished to take up the note that Mr. Wright held, because he had secured a reduction in the interest. It was at the request of Mr. Helm that I signed that note."

H. M. Yerington testified that he was now and had been since 1889 president of the Carson Water Company; that he first became acquainted with and interested in said company in 1877: that he owned two thirds of the stock; that he had been a trustee of the company since 1877; that it has always been the custom of the company, when it wished to borrow money, to do so by resolution of the board of trustees, introduced and passed at a meeting thereof; that the corporation never authorized the renewal of the note of 1875 with the note of 1879 and the note of 1886, and he never knew nor heard of the renewal of the notes, nor the giving of the notes of 1779 and 1886, until after he was elected president in 1889. The following is the manner in which Mr. Yerington says he found out about this transaction: "About two and a half or three years ago I asked the secretary of the company to give me a balance sheet showing the affairs of the company in full. I had not had any and I was not posted with regard to the affairs of the company, and I wanted to see what we were doing. Mr. Richard then came to my office, I think, and he told me about the existence of this note of 1886, and I was very much surprised about it, as I

didn't think we owed anybody anything.  We had borrowed a
large amount from the Firemen's Fund in San Francisco in
1881, I think, and paid off the debts of the company.  We had
paid the Bank of San Jose a large sum and we also paid some
debts in town here, and the current receipts of the company
were sufficient to pay the interest on the debt and any other in-
debtedness.  So I was surprised to find a note against us in
favor of Mr. Wright; but Mr. Richard said that was the way
it stood.  I then found out that the interest had been paid to
Mr. Wright by the secretary, and charged to Mr. Helm, for a
number of years, and of course I was very much surprised to
see that, but I finally got to the bottom of the affair.  A few
days after that I met Mr. Wright, and I found that he owed
the company for water six or seven hundred dollars, and Helm
had explained to me that Wright's water bill had not been col-
lected because Wright insisted that he had a note against him
personally.  However, when I met Mr. Wright, I said to him,
' You owe this money to the company, and I want you to pay
it; ' and he said that Helm owed him, and I said that I could
not help that, that the company did not owe him anything, and
I told him he must pay his water bill.  I said, ' You must pay
us this bill, as we owe money ourselves.'  Then the conversa-
tion returned to the two thousand dollar note, and I said to
him, ' You loaned that money to Helm, and we will not pay it,
as we don't owe it.'  I went to the secretary and told him not
to pay any more money to Mr. Wright for Mr. Helm or for
anybody else."

To repeat in part, Mr. Wright emphatically denies that he
ever had any such conversation as testified to by Mr. Helm in
relation to the note of 1879.  He also denies that Mr. Yering-
ton, in his conversation with him, denied but what the company
owed the money to him, but Yerington complained about
the amount of interest the company had paid on the note.  In
this respect the testimony is conflicting.  It is conceded that
there was no order or resolution made or entered at any time
authorizing the officers of the company, or any one of them, to
execute the notes of 1879 or 1886 in renewal of the note of 1875.

The appellants contend and take the position that it was not
necessary for the trustees of the corporation to have met and
passed a resolution or order authorizing the president and sec-
retary, or either of them, to execute and deliver the notes of

1879 and 1886 in renewal of the note of 1875 or that of 1879 in order to make them corporation notes and binding upon the corporation; and in support of their position they argue (1) that the president and secretary were a majority of the board of trustees, therefore it would be useless for them to call a meeting of the trustees merely for the purpose of adopting a resolution and spreading it upon the minutes, authorizing themselves to renew the notes; (2) that the corporation, having the use of the money, is now estopped to deny the indebtedness; and (3) that the stockholders, having an opportunity to inform themselves as to the liabilities of the company from the balance sheets, they cannot now be heard to say that they had not been informed as to this particular note.

A corporation is an artificial person created by the statutes of the different states, and is vested with the power and capacity to make contracts within the scope of the powers conferred upon it by the act of incorporation and the by-laws which the organizers thereof may see fit to adopt for the government of the corporation and its officers. (*Darmouth College* v. *Woodward*, 4 Wheat. 636; *Providence Bank* v. *Billings*, 4 Pet. 561.) Angell & Ames, treating of private corporations and of what acts are necessary to create and constitute a corporation, and of its actions, powers, etc., at section 110 say, among other things: (5) "To make by-laws, which are considered as private statutes for the government of the corporate body." In 2 Kent, Comm. (13th ed.) p. 300, it is said: "Where a corporation was created for the purposes of trade, it resulted necessarily that they must have power to accept bills and issue notes. But if a company be formed, not for the purpose of trade, but for other purposes, as, for instance, to supply water, the nature of their business does not raise a necessary implication that they should have power to make notes and issue bills; and it seems to be doubted whether there must not be an express authority to enable them to do it. The acts of corporation agents are construed with equal strictness, and it is the doctrine that though a deed be signed by the president and cashier of a corporation, and be sealed with its corporate seal, yet the courts may look beyond the seal, and if it be affixed without the authority of the directors, and that fact be made affirmatively to appear, the instrument is null and void." It was the rule of decisions in years gone by that corporations could only be held responsible for

their contracts and agreements made under seal. This was before the modern era of trade and commerce, which has given birth to corporations organized for the purposes of carrying on and engaging in all branches of business, trades and speculations, and as a rule are incorporated under a general law of the state, and if not prohibited by statute or by its by-laws, and the nature of its business is such as to render the borrowing of money necessary for the purpose of accomplishing the object for which it was incorporated, courts have usually held that they would imply in the corporation, and those who had control of its affairs, who were, according to the provisions of its charter carrying on the corporate concerns, an authority to borrow money for the use of the corporation to carry into effect the purposes for which it was organized, and without which it could not subsist. (*Ketchum* v. *City of Buffalo,* 14 N. Y. 363, and cases cited; *Rockwell* v. *Elkhorn Bank,* 13 Wis. 655.)

The Carson Water Company was organized for the purpose of purchasing and laying in place water pipe, and keeping and maintaining such pipes, leading to and through the town of Carson City, and elsewhere in the county of Ormsby, state of Nevada, for the purpose of supplying the people of the aforesaid town and others with water, and for the purpose of acquiring such real and personal property as might be necessary for the purposes above mentioned. The affairs of the company were to be managed by three trustees, and its principal place of business was to be Carson City, Nev. There is no provision in the articles of incorporation nor in the by-laws that would indicate that the corporation, or any officer thereof, was authorized to borrow money or execute notes, nor is there anything therein contained from which we could infer that such a power is vested in the president and secretary of the company, without first being authorized so to do by the board of trustees. The president of the Carson Water Company is to preside at all meetings of the board of trustees, and call special meetings at such times as he may deem necessary for the interest of the company. The secretary of the company shall keep a record book, in which he shall transcribe the proceedings of all meetings, and issue stock, and keep a list of the names of persons from and to whom stock is transferred. Before a corporation can be held responsible for the contracts of its officers or its agents, it must affirmatively appear that the officer or agent was author-

ized to enter into the contract by the company, or that the company received the benefits derived from the transaction; nor is there anything in the record to indicate that there was a recognized course of dealings whereby these officers were held out as possessing any such power; but, upon the contrary, Mr. Yerington testified "that when the company had to borrow money they always held a meeting and discussed the advisability of doing so, and, if agreed upon, would then authorize the officers to execute the papers." When it is within the implied powers of a corporation to borrow money, execute and put in circulation negotiable paper, and where there is evidence that in the course of its business it has been in the habit of executing and circulating its note made by its officers, and this mode of raising money has been recognized by the corporation, in such case a note, so indorsed by the proper officers, would be held binding upon it when in the hands of a bona fide holder; but these incidental powers are not to be lightly inferred, nor are the officers authorized to go beyond the instructions given them by the board of trustees or those contained in the by-laws.

In the view we take of the case, it is unnecessary for us to review the facts in relation to the giving of the note of 1875. If Wright purchased the Warren note, he did so at the earnest solicitation of Mr. Rice, one of the trustees; and if he advanced the money of the company to retire the Warren note, the company had the use of the money, and the transaction, whichever way it may have been, was afterwards ratified by the board of trustees. (*Seeley* v. *Lumber Co.*, 59 Cal. 23.) The renewal of the note of 1875 by the note given in 1879 stands on a different footing. There is nothing in the records of the proceedings of the board of trustees showing or tending to show that the officers of the company were authorized or instructed to renew the note. But it is not denied but what the company owed the money at the date of the renewal in 1879, and courts have usually held that a contract entered into by a corporation or its officers may not be within the scope of the powers conferred upon it by its charter or by-laws, yet if the corporation receives the benefit therefrom in money it will not be allowed to deny the indebtedness on the ground that its officers were not empowered to make the contract. (*Union Gold Min. Co.* v. *Rocky Mt. Nat. Bank*, 2 Colo. 260; *Bradley* v. *Ballard*, 55 Ill. 413, 419; *Whit-*

*ney Arms Co.* v. *Barlow,* 63 N. Y. 69.)    There is also an increase in the rate of interest mentioned in the note of 1879 over that of 1875.    In the resolution passed by the board of trustees on the 2d day of August, 1875, authorizing the executing of the note of that date, the rate of interest was fixed at one and one-fourth per cent per month.    By the one made in 1879, without any authority whatever, interest was provided to be paid at the rate of one and one-half per cent per month.

The renewal of the note of 1886 does not come within either of the above mentioned rules in this: there was no order or resolution of the board of trustees, nor a majority thereof, authorizing the president and secretary to execute the note.    The renewal of the note must be considered in connection with the powers and duties of the officers who renewed the same, the circumstances under which it was renewed and the benefits derived therefrom by the corporation.    The evidence in the case, as it now stands, is such as to show that the president of the company has made use of his official position to secure to himself the use of money, by issuing what purported to be the company's note, without the knowledge or consent of the board of trustees or the stockholders of the Carson Water Company.

Mr. Helm and Mr. Yerington testified that in 1881 the corporation borrowed a large sum of money to pay off the outstanding indebtedness of the company, including the two thousand dollars due Mr. Wright on the 1879 note.    Mr. Helm testified that he had the check to pay the Wright note, and went to the bank of Wells, Fargo & Co. with Mr. Wright to pay it, and while there had the conversation with Mr. Wright as testified to above; and if the same is to be taken as true, Helm induced Wright to let him retain the money that had been intrusted to Helm by the company to pay off the Wright note of 1879, which Helm says he did use for his individual benefit in paying off his own debts with some and purchased stock with the balance.    The corporation not owing Wright at the time of the renewal of the note of 1886, and Mr. Helm instructing the secretary to charge the interest thereafter paid on the Wright note to his individual account, supports the statement of Helm; and the fact that the secretary drew the checks thereafter "payable to the order of S. C. Wright on account of A. Helm" was a notice to Wright, and he should have inquired into the cause of the change of payment of inter-

est from the name of the company to that of A. Helm if the
statement of A. Helm was not correct. In answer to a ques-
tion asked Helm, " Who was present when this conversation
took place between yourself and Mr. Wright in the bank ?" he
answered: " Nobody was present. I took pains not to say
anything when anybody was around, as I didn't care to expose
my condition at that time." The invalidity of the note of 1886
springs: First, from issuing the same without being authorized
so to do by the board of trustees; second, the corporation was
not indebted to Wright at the time of the giving of the note,
and the same was given without any consideration being re-
ceived by the corporation. It was not sufficient in this action for
the plaintiff to say: " I supposed it was all right and the officers
had authority to renew the note." Persons dealing with cor-
porations are chargeable with notice of the extent of the agent's
powers, and Wright was bound to know that Helm and Richard
could not act beyond the powers vested in them by the board of
trustees and the by-laws. (Mechem, Ag. Sec. 276; 1 Pars.
Cont. 40-42; *Smith* v. *Association,* 12 Daly 305; *Mining Co.* v.
*Fraser,* 29 Pac. Rep. 668; *Owings* v. *Hull,* 9 Pet. 628.) The
action of Helm in drawing up the note of 1886, and signing the
same as president of the Carson Water Company, and inducing
the secretary to sign the same, giving as his reason for such
request that there was to be a reduction in the rate of interest,
was in excess of their powers. Instead of acting for the cor-
poration, they executed a note purporting to be a valid obliga-
tion of the company, when in fact it was to secure the individual
indebtedness of its president for money which the corporation
had intrusted to him to pay its debts, and which he testifies he
was permitted to retain for his own use, with the knowledge and
consent of the debtor, Wright. Under such circumstances, at
the time of the giving of the note of 1886, Helm was acting for
himself, and he was not, with respect to the transaction, an agent
at all; and the corporation is not, as to that matter, bound by
his acts, nor is it chargeable with his knowledge.

In the case of *Frenkel* v. *Hudson,* 82 Ala. 162, Somerville, J.,
in speaking of the general rule that the knowledge of the
agent must be imputed to the principal, said " It has no ap-
plication, however, to a case where the agent acts for himself,
in his own interest and adversely to that of the principle    His
adversary character and antagonistic interests take him out of

the operation of the general rule, for two reasons: First, that he will very likely in such case act for himself rather than for his principal; and, secondly, he will not be likely to communicate to the principal a fact which he is interested in concealing. It would be both unjust and unreasonable to impute notice by mere construction under such circumstances, and such is the established rule of law upon this subject." (Mechem Ag. Sec 723; Aug. & A. Corp. Secs. 308, 309.) It is a cardinal principle in the law of agency that the powers of the agent are to be exercised for the benefit of the principal and not for the agent or third parties, and a person dealing with one whom they know to be an agent, and to be exercising his authority for his own benefit, acquires no rights against the principal in the transaction. Such transactions are usually spoken of by the courts as fraudulent, because circumstances known to both parties make the contract or agreement absolutely void. (Mechem, Ag. Secs. 797, 798.)

It is a well-settled rule in equity that, when the relationship of principal and agent exists, the agent will not be permitted to make use of his position for his own personal interests. This rule is strict in its requirements and inflexible in its operation. It extends to all transactions where the agent's personal interests may be brought into conflict with his acts in the fiduciary capacity; and it is immaterial as to whether there was fraud, or as to whether the transaction was entered into with the best of intentions. When the possibility of a conflict exists, there is the danger to be guarded against by the absoluteness of the rule. It is a violation of duty for any officer of a corporation to enter into a contract with himself, or to so manage the affairs of the company as to enrich himself at the expense of the stockholders. Pomeroy, in his work on Equity Jurisprudence, (volume 2, sec. 959), says: "The underlying thought is that an agent should not unite his personal and his representative characters in the same transaction; and equity will not permit him to be exposed to the temptation, or brought into a situation where his own personal interest conflicts with the interest of his principal, and with the duties which he owes to his principal." See, also, sections 1050, 1051, and notes therein referred to. (1 Beach, Priv. Corp. Secs. 236, 240, et seq.; *Pickett* v. *School Dist.,* 25 Wis. 553.)

In the case of *People* v. *Township Board of Overyssel,* 11 Mich.

225, the court said: "So careful is the law in guarding against the abuse of fiduciary relations, that it will not permit an agent to act for himself and his principal in the same transaction, as to buy of himself, as agent, the property of his principal, or the like. All such transactions are void, as it respects his principal, unless ratified by him with a full knowledge of all the circumstances." (2 Field, Briefs, Sec. 193.) A corporate body can only act by agents, and the directors or trustees of a corporation occupy a position of the highest trust and confidence. The utmost good faith is required in the exercise of the powers conferred upon them. They have no right, under any circumstances, to use their official position for their own benefit or profit, or for the benefit of any one except the corporation. This is one of the reasons given why an officer has no right nor authority to vote upon or represent the corporation in a transaction in which he is personally interested in obtaining an advantage at the expense of the other stockholders. Therefore, if the testimony of Helm be true, the company did not owe Wright any money in 1886, when the note was given, but Helm did; and if such was the case, then the information given by Helm to Richard, upon requesting him to sign the note, as the interest was to be reduced, was misleading and not in accordance with the facts in the case. Under such circumstances, the signing of the note cannot be deemed a corporate act, for the acts of officers of corporations are to be tested by the principles of the law of agency; and no agent whatsoever can bind the corporation if such agent fails to act in accordance with the purposes and objects of the corporation and within the scope of his authority. (*Lyndon Mill Co.* v. *Lyndon Literary & Biblical Inst.*, 22 Atl. Rep. 576; *Reynolds & Henry Const. Co.* v. *Police Jury*, 11 South. Rep. 238; *Miner* v. *Ice Co.*, 53 N. W. Rep. 222; *Johnson* v. *Signal Co.*, 29 N. E. Rep. 966; Ang. & A. Corp. Sec. 291; *Despatch Line of Packets* v. *Bellamy Manuf'y Co.*, 12 N. H. 231; *Hoffman* v. *Insurance Co.*, 92 U. S. 164; *Nelligan* v. *Campbell*, 20 N Y. Supp. 234; Field, Corp. Sec. 271.)

In the case of *Main Jellico Mountain Coal Co.* v. *Lotspeich*, 20 S. W. Rep. 379, the president of the company entered into a contract with one of the stockholders to deliver to him a quantity of coal, the pay therefor to be applied on the payment of the individual indebtedness of the president to the stockholders. In an action by the plaintiff to enforce the contract

and be permitted to apply the price of the coal on the debt, in passing upon this question the court said: "The pleadings do not present the question of fraud by way of defense, but nevertheless, in construing a contract made between officers of a corporation by which a corporate liability is attempted to be created to the one officer or the other, that construction should be placed on its terms most favorable to the corporation; and particularly when the great weight of the evidence, and in fact all of it, shows that corporate property was being used, by reason of this contract, to pay an individual debt of one director to the other."

In the case of *Hardin* v. *Construction Co.*, 78 Iowa, 729, the board of directors authorized the officers of the company to execute a note for nine thousand dollars, and a chattel mortgage upon the rolling stock of the company to secure the payment of the same. The officers executed the note and mortgage and stipulated therein for attorney's fees in case of suit for the collection of the same. The plaintiffs commenced suit to foreclose the mortgage. The district court refused to allow attorney's fees, and the plaintiffs appealed. In passing on this question, the supreme court said: "This was an explicit direction to execute a note for nine thousand dollars and interest, and no more. The company did not, by any official action, authorize the execution of a note in any amount exceeding said sum in any event. We think the court correctly held that the measure of liability was nine thousand dollars and interest." (*Pacific R. M. Co.* v. *Dayton S. & G. R. Ry. Co.*, 7 Sawy. 61.)

In the case of *New York Iron Mine* v. *Negaunee Bank*, 39 Mich. 648, Judge Cooley, in speaking of the powers of corporations and agents to borrow money by issuing notes, at page 651 says: "It is not disputed by the defense that the corporation, as such, had power to make the notes in suit. The question was whether it had in any manner delegated that power to Wetmore. We cannot agree with the plaintiff that the mere appointment of a general agent confers any such power. In *McCullough* v. *Moss*, 5 Denio, 567, the subject received careful attention, and it was held that the president and secretary of a mining company, without being authorized by the board of directors so to do, could not bind the corporation by a note made in its name. *Murray* v. *East India Co.*, 5 Barn. & Ald. 204; *Benedict* v. *Lansing*, 5 Denio, 283, and The Floyd Accept-

ances, 7 Wall. 666, are authorities in support of the view. The plaintiff, then, cannot rest its case on the implied authority of the general agent. The issuing of promissory notes is not a power necessarily incident to the conduct of the business of mining, and it is so susceptible of abuse to the injury, and, indeed, to the utter destruction of a corporation, that it is wisely left by the law to be conferred or not, as the prudence of the board of directors may determine." Judge McCrary, in charging the jury in the case of *Foster* v. *Mining Co.*, 17 Fed. Rep. 130, said: "Upon the first question—as to whether this is the note of the defendant corporation—that is to be determined upon the question whether the person who executed the note on behalf of the corporation, Mr. Penn, the treasurer of the company, was authorized to execute such an instrument. The law upon this subject is that the authority is not presumed from the mere fact that the person assummed the right to give a note in the name of the corporation. A corporation is an artificial person, which must act within certain limits. It differs from a natural person. If an individual gives his note, it is not necessrry to prove anything in the way of authority; but a corporation must act by way of agents, and the authority of the agent who acts for it is not presumed. It may, however, be shown either by showing an express authority—as, for example, a resolution of the board of trustees authorizing a certain party to execute a note on behalf of the corporation—or by a provision of the constitution or by-laws of the corporation authorizing a certain officer to execute promissory notes. It might be shown in that way, but I believe it is not claimed that there is anything of this kind here. It may also be shown by the course of dealings of the corporations, and by facts and circumstances which are sufficient, in the judgment of the jury, to show that the party who executed the note had the authority. If it was the custom of this corporation to permit the treasurer to execute its promissory notes, and if he was in the habit of doing so, with the knowledge of the trustees or of the corporation, which means, of course, the trustees, they had, by recognizing that custom and acting upon it, themselves become bound by it, and especially if they received the benefits of transactions of this sort, which they permitted the treasurer to enter into. It is only, therefore, necessary for you in considering this branch of the defense to

inquire whether the evidence here establishes the fact that Mr. Penn, the treasurer, was in the habit of acting for and on behalf of the corporation in executing promissory notes and other instruments of like character, and whether the corporation was aware of that fact, and made no objections to it. If you find this to be so, then you will come to the conclusion that the note was executed by the corporation, and you will proceed then to the other question; that is, whether the corporation was indebted to Mrs. Foster in the amount of money for which this note was given."

In the case at bar it was necessary for the plaintiffs to prove that the president and secretary were authorized by the board of trustees to renew the note in 1886, or that it had been the custom of the company to transact business in that way, and that the trustees were knowing to the fact and acquiesced in such procedure. It was also a question of fact to be determined from the evidence as to whether the Carson Water Company owed S. C. Wright the sum of two thousand dollars when the note of 1886 was executed, or was it the individual indebtedness of A. Helm. If the president and secretary of the Carson Water Company did not have the power to borrow money and execute a note in the first instance without being authorized so to do by the board of trustees—which we think they did not— they did not possess the power to renew the same without authority from the board so to do; for when the adoption of any particular form or mode is necessary to confer authority upon agents of corporations in the first instance, there can be no ratification except in the same manner, or it should be made to appear that the company was in the habit of issuing promissory notes without such authorization. In order to hold the corporation responsible upon the note of 1886, it was necessary to show that the officers had authority to renew the same, or that the company had at that time the use of the money. (*Middlesex County Bank* v. *Hirsch Bros. Veneer Manuf'g. Co.*, 4 N. Y. Supp. 385.)

Plaintiffs contend that the action of the president and secretary in executing the note of 1886 has been ratified by the defendant by reason of its having paid the interest becoming due each month from 1886 until 1889. We do not think that the evidence supports the plaintiffs' contention. Mr. Helm, the president, and Mr. Richard, the secretary, testified that the interest

was paid by Helm from 1881 until the payment of interest was discontinued in 1889. True it is that it was paid by company's check, but always on account of A. Helm; and, as we understand the evidence, the amounts were charged against Helm's private account on the books of the company. Mr. Helm says: " No member of the company knew anything about this transaction with Wright except myself." Mr. Richard says: " I knew nothing about the giving of the note of 1886, or why it was given, except as Helm told me it was to secure a reduction in the rate of interest; and at Helm's request I signed it." Mr. Yerington testified " that he was a trustee of the company from 1877 until 1889, when he was elected president. He was the owner of two-thirds of the stock, and never knew of the existence of the note until after his election as president in 1889. As soon as he heard of the existence of the note he sent for Helm, the former president, and Richard, the secretary, and after being informed by them as to how the note of 1886 was executed, he went and saw Mr. Wright, and informed him that it was not the company's note, and that the company would not pay it, and instructed Richard, the secretary, not to pay any more interest on the note." There is no testimony in the transcript from which we could infer that the corporation had the use of or received any benefit from the Wright money after 1881. Under these circumstances the making of the note of 1886 should not be held to be a corporate act. (*Craft* v. *South Boston Railroad Co.*, 150 Mass. 208; *First Nat. Bank of Middletown* v. *Council Bluffs City Water Works Co.*, 9 N. Y. Supp. 860; *Bohm* v. *Brewery Co.*, Id. 514; *Wahlig* v. *Manufacturing Co.*, Id. 739; *Westervelt* v. *Raddle*, 55 How. Pr. 370.)

With regard to the question of ratification, it is to be observed that this is not a case, as presented to us, in which the officers of a corporation have exceeded the powers delegated to them by the corporate body in entering into an unauthorized contract. When the proceeds of such unauthorized act have come into the defendant's treasury, and had been used in the regular course of its business, with the knowledge of the trustees or stockholders, under such circumstances very slight evidence would be sufficient to establish the company's liability. But when it is made to appear that such unauthorized contract was entered into by two of the three trustees, without the knowledge or con-

sent of the third, and in fact one of the two who signed the note not knowing the facts connected with such renewal and, as appears from the evidence, not for the benefit of the corporation but for the individual benefit of one of the two who signed the note, the property of the third, or that of the other stockholders, if there are any, ought not to be held liable on the void contract, without it is made clear that the third acquiesced in the proceedings, and ratified the acts of the other two, after having been fully advised as to all the material facts in the case and given an opportunity to act.    The evidence in our judgment is insufficient to show a subsequent ratification, either express or implied.    The president and secretary certainly were not competent to ratify their own unauthorized acts.    (*Hotchin* v. *Kent,* 8 Mich. 527; *Dabney* v. *Stevens,* 40 How. Pr. 344; Story, Ag. Sec. 243; *Howell* v. *McCrie,* 36 Kan. 652; *Combs* v. *Scott,* 12 Allen, 496; *Mallory* v. *Mallory Wheeler Co.,* 61 Conn. 141; *Despatch Line of Packets* v. *Bellamy Manuf'g Co.,* 12 N. H. 232; *Lyndon Mill Co.* v. *Lyndon Literary & Biblical Inst.,* 22 Atl. Rep. 577; *Owings* v. *Hull,* 9 Pet. 629; *Bohm* v. *Brewery Co.,* 9 N. Y. Supp. 515; *Murray* v. *Lumber Co.,* 143 Mass. 250; *Fitzhugh* v. *Land Co.,* 81 Tex. 310; *Dedham Institution for Savings* v. *Slack,* 6 Cush. 411.)

The plaintiffs argue that by reason of the fact that the secretary made out statements showing the indebtedness of the company, in which the claim of Wright was included, was sufficient notice from which the stockholders could have informed themselves as to this claim; and they not having done so, the company is now bound by the acts of the officers who signed the note.    Mr. Richard testified that he did make out statements of the company's affairs in gross.    How many or how often such statements were made out he does not state, but he does say that he never made out and submitted to the board of trustees an itemized statement prior to 1889, and that the Wright note was never mentioned at any of the meetings of the board, to his knowledge.    We do not think that statements made out in the manner in which it is said they were were sufficient to impart knowledge to the stockholders as to who the creditors or debtors of the company were.    As we understand the law to be, it is this: That before an individual or corporation can be held to have ratified the unauthorized acts of his or its agents, every detail

of the transaction must have been made known to the principal. If, after obtaining such knowledge, the principal fails to act, long and continued silence will be deemed an approval of the act, and such ratification relates back and is equivalent to a prior authority to make the contract. (1 Daniel, Neg. Inst. Secs. 316-319; *Stark Bank* v. *United States Pottery Co.*, 34 Vt. 146; Story, Ag. Sec. 239; *Commercial Bank* v. *Jones*, 18 Tex 816; *Smith* v. *Tracy*, 36 N. Y. 82; *French* v. *O'Brien*, 52 How. Pr. 398; *Combs* v. *Scott*, 12 Allen 497.)

In the case of *Yellow Jacket Silver Mining Co.* v. *Stevenson*, 5 Nev. 228, Lewis, C. J., speaking for the court, said: "So, where it is sought to charge a corporation with the ratification of an unauthorized act of an agent by reason of its acceptance of some benefit or advantage from it, it should appear that such benefit was accepted with full knowledge of the character of the act. The evidence in this case, however, is clear and positive that the board of trustees which was the authorized agent of the corporation knew nothing of the terms, nor even of the existence of the lease in question. The money paid by the appellants was reported by the superintendent to the board as received for ores sold. Nothing seems ever to have appeared in his reports from which it could even have been inferred that the money paid by or due from Stevenson to the company was for the use or rental of any portion of the mine. How then can it be held that the acceptance of money by the board reported to it as being for ores sold was a ratification of the lease executed to the appellant? The company did not know of such lease, nor were there any such circumstances connected with the acceptance of the money as to place it upon inquiry, or to charge it with presumptive notice of its existence. If, then, it be the law that there must be a full knowledge of all the material facts before the acceptance of profit or advantage by the principal will be held to constitute a ratification, surely the respondent here cannot be held upon the lease in question, for it knew nothing of the material facts respecting it. If it were shown that the board knew of the lease, the acceptance of payment from Stevenson for the ore extracted would doubtless be sufficient to establish a ratification; but the contrary being shown, it would manifestly be opposed to the well-settled rules of law to hold such acceptance to be a ratification. * * * It cannot, we think, be maintained that the knowledge obtained unofficially by three of the trustees that

Stevenson was engaged in extracting ore from the mine is suffi-
cient to charge the company with such knowledge.  As any
number of trustees, acting individually and not as a board,
cannot act for the corporation, so any information obtained by
individual trustees and not communicated to the board, should
not, it would seem, become the foundation of a contract bind-
ing upon the company.  The trustees represent the corporation
only when assembled together and acting as a board.  Such
being the law, how can it be claimed that information com-
municated to them individually, but not to the board, can be
made the foundation of an implied contract on the part of the
corporation ? " (*Hillyer* v. *The Overman Silver Mining Co.*, 6
Nev. 55.)

It is to the interest of the public that there should be a
speedy termination of a lawsuit; but there is another principle
of public policy that should not be lost sight of, and that is
that no man should be deprived of his property to pay another's
debts without it clearly appears that he has placed himself in
that position wherein the law says, " You have assumed the re-
sponsibility and you cannot be released therefrom."

The evidence in this case is conflicting and obscure in many
particulars.  The motion for a new trial was made upon the
ground, among others, that the findings of fact were contrary
to and not supported by the evidence, and that the judgment
was contrary to law.  It does not appear on what ground the
motion was granted.  The granting or refusal of a motion for
a new trial on the ground of the insufficiency of the evidence
to support the findings is addressed to the sound discretion of
the judge who presided at the trial of the case in the lower
court, and on an appeal from such order, where the court
below, in the exercise of a sound discretion, grants a new trial
on conflicting evidence, appellate courts have always refused to
disturb the order.  (*Kellenberger* v. *Market Str. Cable Railway
Co.*, 33 Pac. Rep. 90.)

The order of the district court in granting the new trial is
affirmed.

BIGELOW, J., dissenting:

For the purpose of clearing away the cloud of dust that seems
to envelop this case, I propose to first ascertain what the case

is, and what the issues were that were to be tried in the district court.

The complaint alleges that on December 1, 1886, the defendant made, executed and delivered to the plaintiffs a certain promissory note, which at the commencement of the action was, with a portion of the interest, due and unpaid, and for which it asked judgment.

The answer as to the note consists of denials only. It denies that the defendant ever made, executed or delivered the note in suit. Neither want of consideration, fraud in its execution, estoppel or payment is plead. To cite authorities to the effect that unless pleaded neither of these defenses should be considered is carrying coals to Newcastle, but I will refer to the following: Pom. Rem. & Rem. Rights, Secs. 664, 675, 709, 712, 730; Bliss, Code Pl. Secs. 211, 269, 274, 357; *Sharon* v. *Minnock*, 6 Nev. 377; *Hanson* v. *Chiatovich*, 13 Nev. 395.

This, then, was the sole issue to be tried: Was the note the defendant's note? If it was, judgment should go against it; if not, in its favor. A corporation can act only through its officers or agents. When we wish to ascertain what a corporation has done, we ask what its authorized agents have done. In this country, for all practical purposes, the board of trustees is the corporation, so far at least as its relations to the public are concerned. (*Railway Co.* v. *McVay*, 98 Ind. 391.) In this case there is no question but that the power to execute promissory notes rested in the board of trustees. As the note of 1879, which had been executed alone by the president and secretary, had been recognized and acted upon by the corporation for a number of years as a legal and binding obligation against it, it admits of large question whether these officials were not impliedly authorized to execute also the note in suit (*Wilcox* v. *Railroad Co.*, 24 Minn. 269; Mechem, Ag. Secs. 84, 274; Story, Ag. Secs. 55, 87); but I will pass that by and look only to the acts of the trustees. That body could have authorized its execution in the first place or they could subsequently ratify the act of making it. (Story, Ag. Sec. 244.) In *Cook* v. *Tullis*, 18 Wall. 332, 338, Justice Field, said: "The ratification operates upon the act ratified precisely as though authority to do the act had been previously given." The same principle applies equally to corporations. (2 Mor. Corp. Sec. 618.)

There was no formal resolution of the board ratifying the

making of the note, but the evidence is to my mind overwhelming and conclusive that they did so ratify it by silence and acquiescence, and are now estopped to question its validity. In *Kelsey* v. *Bank*, 69 Pa. St. 426, 429, the court uses this language: " The law is well settled that a principal who neglects promptly to disavow an act of his agent, by which the latter has transcended his authority, makes the act his own; and the maxim which makes ratification equivalent to a precedent authority is as much predicable of ratification by a corporation as it is of ratification by any other principal, and it is equally to be presumed from the absence of dissent." Again, in *Murray* v. *Lumber Co.*, 143 Mass. 250, the court said: " When the alleged principal is a corporation, a ratification may be shown by proving that the officers who had the power to authorize the act knew of it and adopted it as a valid act of the corporation, although no formal vote is passed by them." Mr. Morawetz says: " The ratification by a corporation, acting through one of its agents, of an unauthorized act performed by an inferior agent, may be shown in the same manner as a ratification by the company directly. Acquiescence is good evidence of consent, and if the agents of a corporation who have the power to ratify an unauthorized act performed by another agent manifest no dissent after full notice, a ratification of the act may often be presumed." (Mor. Corp. Sec. 633.) In 1 Beach. Corp. Sec 195, the rule is stated thus: "Any officer or agent of a corporation may give validity to the unauthorized acts of his subordinates, provided they be of a kind which he might have authorized them to perform. Thus directors may ratify the unauthorized acts of their appointees or the acts of other corporate officers, which should not have been done without authority first obtained from the directors. * * * Ratification by directors may be made by accepting the report of a committee stating the facts, or by the acquiescence of a majority of the directors with full knowledge of the contract so ratified. Ratification may also be presumed from a failure to exercise promptly the right of disaffirmance." *Sherman* v. *Fitch*, 98 Mass. 59, was an action upon a mortgage executed by the president of the corporation without formal authority. The court said (page 64): " The remaining consideration relates to the authority of Sampson to execute the mortgage in behalf of the corporation. It is not necessary that the authority should be given by a formal vote.

Such an act by the president and general manager of the business of the corporation, with the knowledge and consent of the directors, or with their subsequent and long-continued acquiescence, may properly be regarded as the act of the corporation. Authority in the agent of a corporation may be inferred from the conduct of its officers, or from their knowledge and neglect to make objection, as well as in the case of individuals. The absence of one of the directors in Europe could not deprive the corporation of the capacity to act and bind itself by the acts of the officers in actual charge of its affairs." Hundreds of authorities could be cited to the same effect, but these are sufficient to demonstrate that, if a board of trustees of a corporation, or a majority of them, know of and acquiesce in the making of a promissory note by an unauthorized officer, it becomes the note of the corporation. Upon this point it only remains to show from the evidence that such was the case here.

In 1875, the plaintiff purchased a note against defendant for the sum of two thousand dollars. On August 2d of that year, by resolution of the board of trustees, a new note was duly made and delivered to him in place of the old one. Interest was paid on this every month up to 1879, when it was renewed by the president and secretary, but without any formal authorization by the board of trustees. Interest was regularly paid on this note up to 1886, when it was again renewed by the giving of the note in suit, on which interest was paid up to 1889. I do not overlook the fact that from 1881, the interest so paid was charged to Mr. Helm, but that fact, as I will hereafter show, is immaterial, and is certainly immaterial to the question now in hand, which I will again repeat, is simply whether this note is the note of the corporation. From 1881 the board consisted of Mr. Helm, the president, Mr. Richard, the secretary and Mr. Yerington. Two of these trustees, composing a majority of the board, signed this note. These two could have met at any time, and either with or without the consent of the third, could have entered upon the minutes a formal order authorizing the making of the note or ratifying it after it was made. The fact that they also occupied the positions of president and secretary would in no manner curtail their power as trustees. These two—a majority of the board—certainly knew of and acquiesced in the continued existence of the note of 1879, and as they made the note of 1886, and knew all about it, there is not much chance to say that

they did not, as trustees, acquiesce in and ratify their act as president and secretary in executing the latter. This, under all the law that I have found or have knowledge of, made it the note of the corporation, and entitled the plaintiff to the judgment obtained by him. In *Dexter, Horton & Co.* v. *Long*, 2 Wash. St. 435, where a somewhat similar situation existed, the court said: " Another objection raised by the appellant is that the mortgage was not executed by the trustees of the defendant corporation, but that the president and secretary by whom the mortgage was executed had no authority to enter into such a contract, and that it was therefore ultra vires. Even conceding that the contract was ultra vires, and that the appellant has placed himself in· a position in this case to legally allege it, under the testimony in this case it will not avail against the plaintiff. The corporation was attempting to execute a bona fide mortgage. It was within the power of the corporation to execute it, and its officers and agents were trying to carry out the will of the corporation. There were but three trustees, and two of them signed the mortgage, but not as trustees. They did not go through the form of an authorization by resolution, but a majority of those who had power to pass the resolution, by a short cut brought about the result which the resolution would have authorized."

In regard to the want of action by the board, Mr. Helm testified:

" Question. With reference to the note of 1879, was the making of that note, or the execution and delivery of that note of July, 1879, to Mr. Wright, ever ratified by the board of trustees of the corporation?

Answer. I always supposed that the note had been authorized by the board, and how it happened that the record was not made of it I cannot tell. * * *

*       *       *       *       *       *       *       *       *

Q. It was the same course of proceeding with reference to the note issued December 8, 1886, that was proceeded with with reference to the issuance of the note of 1879; that is, there was no ratification or authorization of either, so far as the records show, or so far as your recollection serves you?

A. I never thought about it being required by the by-laws."

If these two trustees that signed this note had entered a formal resolution upon the minutes, directing or ratifying its

execution, there could then be no question that it would be the note of the corporation; and under the circumstances existing here, to make the case turn upon the fact that they neglected to do so, or overlooked the necessity of its being done, is in my judgment to sacrifice justice to the veriest technicality.

But if these two trustees had had nothing to do with the execution of the note, and had known no more of it than Mr. Yerington did, under the uncontradicted evidence in the case the corporation should still be held to be estopped by acquiescence and laches from contesting its validity.

Mr. Richard, the secretary, testified as follows:

"Question.   Did you, as secretary of the defendant corporation, make out and submit to the board of trustees of defendant, at its meetings held at various times between December 8, 1886, and August 1, 1889, and also between December 8, 1886, and the date you became secretary of the defendant, statements and balance sheets showing in gross that this note with other indebtedness, was, during said time, outstanding, and also that interest was being paid on it monthly by the company to Wright?

Answer.   I did.

Q.   Was there ever any objection raised at any time to the payment of the interest on this note?

A.   No, sir.

Q.   No member of the board ever objected to the payment of the interest?

A.   Not until the time of its discontinuance.

Q.   That was in 1889?

A.   Yes, sir.

        *        *        *        *        *        *        *        *        *

Q.   The note of 1886 appears on your books as an outstanding indebtedness?

A. Yes, sir.

Q.   Why was bills payable never credited to that?

A.   I am not aware of that; I presume the credit is there."

Then, during all these years, the books of the company showed that this note was a part of its outstanding indebtedness.   In every report made by the secretary it was included as a part of that indebtedness, and these reports showed, as of course the books did, that interest was being paid upon it every month.   In addition, every member of the company must have known, if he knew anything about the company's business, that

the two thousand dollars borrowed to pay the note were still in Mr. Helm's hands.

Mr. Yerington testified that he did not know of the existence of either the note of 1879 or of 1886, but if not, with all these means of information before him, it must be admitted that he was not paying very close attention to the affairs of the company. It is possible that he had such confidence in the other trustees that he did not attend the meetings of the board, or paid but little attention to the business when he did; but it is hardly necessary to say that, under the circumstances, such voluntary want of knowledge upon the part of one or all the trustees should not relieve the company of a liability that would have existed if they had had such knowledge. Every member of the company had such knowledge or such notice and means of knowledge of the note that he must be held to have known it. It is one of the simplest principles of justice that a man must not shut his eyes to the means of knowledge surrounding him and then claim that he did not know that which he could so easily have ascertained. If his confidence in others has misled him, he, or the company he represents, and not another, who had no means of knowing of the ignorance of the first, should suffer the consequences. Under the circumstances shown by the testimony, Wright had no possible reason to suppose that Yerington and all other members of the company did not know of this note. The slightest examination of the books or reports, a mere inquiry as to whom or for what the company owed this money, would have made the whole thing clear. The authorities to the effect that want of knowledge, under such circumstances, constitutes no defense, are numerous and well considered.

In Morawetz on Corporations (section 630) the author says: "In some instances a principal may be estopped from repudiating an unauthorized act, of which he had no actual knowledge; as where the principal ought by reason of the relation of the parties to have known of the act, and cannot in equity and good conscience set up his ignorance. Nor can the shareholders of a corporation avoid responsibility for the unauthorized acts of their agents by abstaining from inquiry into the affairs of the company, or by absenting themselves from the company's meetings, and at the same time reap the benefit of their acts in case of success. If a shareholder fails to take the

trouble of inquiring into the affairs of the corporation of which he is a member, or to attend its meetings, it seems no more than just that his supineness should be construed as an acquiescence in the proceedings of the majority." In *Olcott* v. *Tioga Railroad Co.*, 27 N. Y. 546, where the question was whether the corporation had ratified the unauthorized act of the president in executing a bill of exchange, the court said (page 560): "But the subsequent rendering of accounts to the board of managers containing entries of such payments, unobjected to on the part of the board, affords a strong presumption of a ratification of those acts." In *Conover* v. *Insurance Co.*, 1 N. Y. 290, 292, it was said: "And it is insisted that. inasmuch as the board never by any formal act gave their sanction, and the by-laws required the consent in writing of the directors to any conditional alienation by mortgage subsequent to the insurance, the consent in this case was unauthorized and void. I cannot subscribe to this doctrine. The directors were bound to know the uniform course pursued by their sole agent in the transaction of their business at their office, especially where regular entries of his acts were made in their books; and they must be held responsible on the ground of a tacit assent and approval unless they can show that by a strict vigilance and scrutiny into his acts they were unable to ascertain the course he was pursuing, and could not therefore arrest it or put the public on their guard."

In *Jones* v. *Agricultural Co.*, 38 Ark. 17, it was held that the directors are conclusively presumed to know the pecuniary condition of their company; and in *Corbett* v. *Woodward*, 5 Sawy. 403, 416, Deady, J., said: "Be this as it may, the law will not permit a person to become a director in a corporation, and neglect the duties and avoid the responsibilities thereof as to third persons with impunity. A voluntary ignorance of what it is his duty to know and understand is no excuse for him when the rights of others are in question. By becoming a director, which includes the taking of an oath to 'faithfully and honestly discharge' the duties of the office, he engages to take good care of the interests of the stockholders and creditors intrusted to his charge, and this necessarily implies that he will use due diligence to keep himself properly informed concerning the same."

There is a distinction, sometimes drawn in the cases, but more often ignored, between ratification of an unauthorized act,

and such acquiescence and laches in the matter as will be held to estop the principal from denying the want of authority. (2 Mor. Corp. Sec. 628.) It is unnecessary to more than refer to it here, for the reason that rejecting the plaintiff's testimony wherever it conflicts with that of the defendant, and taking the view of it most favorable to the defendant, as under the circumstances we are required to do, it shows both ratification of the note by the corporation, and such facts as should estop it from contesting its validity. There can be no question that the note of 1875 was a valid and binding obligation. If the corporation did not intend to ratify the execution of the note of 1879, taken in its place, it should have promptly notified the plaintiff and returned the old note, and then he could have still maintained an action upon the latter. Not having done so, but on the other hand, having paid interest on the new note, and recognized it in every way as the company's note, that also became a valid obligation that the plaintiff could have maintained an action on. The same remarks hold true of the note of 1886. Had its execution been promptly repudiated, the plaintiff could still have maintained an action on the old obligation. Not having been, but on the contrary having allowed the plaintiff to rest in the belief that the new note was regular and valid, until the old one was perhaps barred by the statute of limitations, and at least never returning or tendering it to him, to allow the corporation to now repudiate the note operates as a fraud upon the plaintiff and the company should be held estopped to make such a defense. " This principle is believed to be applicable to all cases in which the parties acting in the belief that the agency is valid, have suffered a change of circumstances, and cannot be restored to the position in which they would have been if the agency had been repudiated immediately upon notice of the unauthorized act." (Hallett, J., in *Union Gold Min. Co.* v. *Rocky Mt. Nat. Bank,* 2 Colo. 248, 262.) This case, which is very much in point and quite instructive, was three times before the supreme court of Colorado, and was subsequently confirmed in the United States supreme court (96 U. S. 640). It was there held that where the president of a mining company was informed of an indebtedness incurred without authority by the general manager, and the company did not within a reasonable time repudiate the act of the manager in borrowing the money, such notice to the president was notice

to the company, and the jury would be authorized to conclude that the company had consented to what had been done in its name.   In a concurring opinion, Wells, J., said (2 Colo. 265): " I grant that if by such attention to its affairs as a man of ordinary prudence in the like case would have exercised the corporation might have informed itself of Becker's doings, it is the same as if they had actual knowledge.   The corporation ought not to be heard to say that it did not know that which by the ordinary diligence which the law exacts of them they might have known."   I deem it unneccessary to follow this further, except to add, to avoid misunderstanding, that the plaintiff, having had no call or opportunity for pleading this estoppel, may, contrary to the rule that should be applied to the defendant, rely upon it without such pleading.   (*Clink* v. *Thurston*, 47 Cal. 21; Bigelow, Estop. 584.)

The foregoing will sufficiently indicate the ground upon which I think the case should be decided; but under the circumstances, I deem it proper to follow it up a little further.   I must confess that I have found it quite difficult to determine from the opinion of my learned associates just what ground or grounds they have placed their judgment upon.   With all deference, it seems to me that, while no one of them is in the end relied upon, the doctrines of payment, want of consideration, ratification, and other subjects, are quite confusedly mixed together; perhaps upon the theory that, even though no one of them may be sufficient, all put together must be.   They seem, however, among other things to hold that what took place in 1881 between Wright and Helm constituted a payment of the company's indebtedness to Wright, a transfer of their liability to Helm, and in some manner prevents the note of 1886 from being the company's note.   In my judgment, under the pleadings and circumstances existing here, it should make no difference in the result whether it did or did not constitute a payment of the note of 1879   Wright claimed that it did not, and the note of 1886, upon which the action is brought, was made in place of the old one.   As so often stated, the question is, is this the company's note?   But it could be their note even though they owed Wright nothing, the same as an individual might make a note even though he owed the payee nothing, and received no consideration for making it.   If the note of 1879 was paid, then that note might be no sufficient

consideration for the note of 1886, but that would be its only possible effect; and as no want of consideration is pleaded, under all rules of pleading that should cut no figure in the case. To illustrate: If the execution of the note had been formally authorized by the board of trustees, then certainly there could be no question that it was the note of the corporation; but if the indebtedness had been paid in 1881, the defense of want of consideration might still exist. At any rate, this matter does not help us the least bit to determine whether the company has through its representatives ratified the execution by its president and secretary of the note in question, so as to make it the company's note, and consequently it is entirely immaterial.

But if mistaken in this, and it be material, then it seems clear that the transaction of 1881 did not constitute payment, nor in any manner release the company from its obligation to pay Wright the money due either upon this note or the one of 1879. Neither by pleading nor proof is it claimed that there was any fraud, deception, misrepresentation or concealment in that matter, nor does it appear that any was intended or contemplated. We have, consequently, only to analyze the transaction and to determine what was really done there and its legal effect.

As the plaintiff denies the conversation with Helm *in toto*, the view most favorable to the defendant is to adopt Helm's version of the matter. Mr. Helm testified as follows: "I got home Sunday, and on Monday following I met Mr. Wright and I told him I had the money to take up that note. We went to Wells-Fargo, where he had a tin box. He went into the vault, got the box and brought it on the counter, opened the box, took out the note, held it in his hand. I said to him that I was in a tight place myself and I said to him, 'Sam, you don't need this money, and I need it awful;' and I said, 'I will give you my third of the Water Company's stock as security, and let me keep this money.' * * * I had three hundred and thirty-three shares, and I said 'Give me this two thousand dollars and you can have the stock;' and he asked me about the stock and how much there was of it, and finally he said, 'I don't believe I want your stock, but let it run as it stands and you can pay it in a few months, and you can pay the interest and let it be as it is and not make any change.' I objected to it, but he said, 'Let it be as it is.' * * * I used the money represented by the

check.   Then I ordered the interest paid at the office charged
to me.

Question.   Do you know who drew the money represented
by the check you speak of  *  *  *  whether you drew it or
whether Mr. Wright drew 'the money ?

Answer.   I presume I did.

Q.   Did Mr. Wright ever surrender to you the note of the
Carson Water Company that he held against the company as
his security ?

A.   No, sir.

Q.   Mr. Wright never did surrender that note ?

A.   No, sir.

     *   *   *   *   *   *   *   *   *   *

Q.   You will not state that you delivered him a dollar or paid
him the check for the Carson Water Company at that time ?

A.   I don't think I did."

There can be no dispute that in this tranaction Helm did not
pay Wright any money, or transfer or deliver the check to him,
or transfer or deliver anything to him.   He received nothing
from Wright, gave him no note or security, nor did he by word
or deed become bound for the payment of any money to Wright.
The whole transaction amounted to simply this:   Wright got
nothing, either in the way of money, notes or security; but as a
matter of good-natured accommodation to Helm, and without
any possible advantage to himself, did not insist upon the pay-
ment of the note at that time and agreed to let the matter stand
as it was.   On the other hand, he refused to surrender the com-
pany's note, and take Helm's note and stock in place of it.
Helm was the company's agent to pay this money.   Can any
one claim that in his hands the check was not the company's prop-
erty, and represented the company's money ?   Wright could
have no title to it until it should be paid to him, and could in
no manner have compelled Helm to pay it to him.   If not paid,
his only remedy would be against the company upon the note.
When it was not paid, can there be any doubt that it was still the
company's property. and that they could have compelled their
agent to give it up to them ?   It follows that when Helm used
it, it was the company's check and money that he used.   The
most that can be said is that Wright consented to Helm's keep-
ing the company's money.   Helm was the president and busi-
ness manager of the company.   Wright evidently looked upon

him as being the same as the company. To Wright's compre-
hension, if Helm did not pay the money to him there was noth-
ing to prevent his keeping it, and it would be all right. At any
rate, it is not claimed that there was any fraud in the matter, or
anything that estops Wright from asserting his claim against
the company; so, if it was not a payment, it is immaterial what
else it was. Admitting that it was wrong for him to consent to
Helm's keeping the company's money, and that he was to such
an extent his brother's keeper that he should have said: "No,
you must not do this," still the question is not whether it was
right, but whether, contrary to the understanding and intention
of both, it constituted a payment of the note and substituted
Helm as the plaintiffs' debtor.

Helm's acts show that he had a perfectly clear understanding
of the transaction. He understood that the note was still an
outstanding and binding obligation upon the company; but
because he had used the money that should have gone to pay it,
he was in duty bound to protect the company, both as to the
principal and interest. Hence his statement to the secretary
to charge the interest to him, and that he would protect the
note at all hazards. Wright also understood that the note had
not been paid, that the company still owed it to him, and he
never made any claim upon Helm on account of it. To avoid
misunderstanding, it should be stated that the evidence shows
that his claim to offset his water bill against Helm's indebted-
ness to him was on other money that Helm owed him, and not
on this note.

There can be no payment where the debtor gives up nothing,
the creditor receives nothing, and neither party understands
that any payment has been made. When Helm used this money
he became the company's debtor; and if it has never been
paid—as presumably it has not—he still owes it to them, but
he owes nothing by reason of it to Wright. If Wright had
only the same confidence in Helm that the company seem to
have had, there was still no reason for him to think that his use
of the money was not known to all, and entirely satisfactory,
for no objection was made for some eight or nine years, and
very possibly not until it was found that Helm was unable to
replace it. It would hardly seem possible that under the cir-
cumstances existing here two thousand dollars could disappear
from the exchequer of a company handling no more money than

this one presumably handled, and every one interested in the company or paying any attention to its affairs not know all about it. Had the arrangement between Helm and Wright been made for the purpose of enabling Helm to defraud the company of the money, by inducing the belief that the note had been paid with it when it had not, and particularly had Wright represented to any of the company's officers that it had been paid, this would probably constitute a defense to the company, as Wright would be estopped to deny that such was the case; but it is not claimed by any one that anything of this kind exists here. No pretense was made by anybody that the note had been paid, or that the money was not still in Helm's hands.

It is said that an officer cannot ratify his own unauthorized act, and consequently I suppose that Helm and Richard, as trustees, could not ratify their act as president and secretary in issuing the note. This might be admitted, for as shown, the whole company had such knowledge, or such notice and means of knowledge as amount to knowledge, that by their silence, acquiescence and laches they have given validity to the unauthorized act; but it is unnecessary to do so. This rule simply goes to the extent that an officer who did not have authority to do a thing in the first place cannot, in the same capacity, ratify it so as to make it legal; but no case ever decided that an officer occupying two positions, one above the other, could not in the higher capacity ratify an act that he did not have authority to do in the lower capacity.

Again, it is said that Helm could not act in the execution or ratification of this note, because he was really giving the company's note for his own indebtedness to Mr. Wright. There would be something in this were it not based upon an assumption entirely unsupported by the evidence. As I think has been successfully shown, it was the company and not Wright that Helm owed, and the company still owed Wright. Giving the new note neither paid, released, extended, nor in any manner affected Helm's debt to the corporation. Consequently it was entirely immaterial to him in his individual capacity whether the new note was or was not made. The only question in that transaction was whether they should pay the old note, or extend it by making a new one, and this was a matter to be determined only by the financial situation of the company and like considerations.

As to the case of *Yellow Jacket Mining Co.* v. *Stevenson*, 5 Nev. 224, while it was perhaps upon the whole correctly decided, that part of the language quoted by my associates from pages 231, 232 of the opinion is not law, nor was it decided so to be in that case. It is dictum, and the opinion shows that even the judge writing it had doubts of its correctness, for he immediately adds (page 232): "But, however this may be, it cannot possibly be maintained that a corporation can be charged with acting upon or recognizing a fact which is known only to a minority of its trustees." This is the real ground of the decision—that is, that it had not been shown that a majority of the board knew of the transaction—and if not, the decision is doubtless correct upon that point, because as the minority could not by formal resolution either authorize the action in the first place or ratify it afterwards, knowledge and acquiescence upon their part could not have that effect; but in the case at bar it is shown that a majority of the board knew all about the whole situation, and that the company, by reason of the silence, acquiescence and laches of both the board and stockholders is estopped to deny its liability. Corporations should be held to the same principles of honesty and fair dealing that individuals are. But as they can only act through their agents, if acquiescence and laches upon the part of the agent will not constitute ratification and estoppel by the corporation where it would in the case of individuals, then they are exempt from the rules applying to others. That a corporation may ratify or estop itself by the knowledge and acquiescence of its representatives in unauthorized acts, without the knowledge being received or acted upon at a formal meeting of the board or stockholders, see in addition to the cases already cited, *Scott* v. *Railroad Co.*, 86 N. Y. 200; *Scott* v. *First M. E. Church*, 50 Mich. 532; *Hoosac Milling Co.* v. *Donat*, 10 Colo. 529; *Kent* v. *Mining Co.*, 78 N. Y. 187; *Fidelity Ins., T. & S. D. Co.* v. *Shenandoah Val. R. Co.*, 32 W. Va. 257; *Sheldon Hat Blocking Co.* v. *Eickemeyer Hat Blocking Co.*, 90 N. Y. 613; *Smith* v. *Ayer*, 101 U. S. 320; *Phosphate of Lime Co.* v. *Green*, L. R. 7 C. P. 63.

There are many other statements made in the opinion of my respected associates in which I do not agree, but the length which this opinion has already reached admonishes me that I should draw it to a close.

For the foregoing reasons I am of the belief that the judg-

ment as entered in the district court was correct, and the order granting a new trial was wrong. I therefore dissent from the judgment.