RONALD J. GOLDSTEIN AND MARY E. GOLDSTEIN, APPELLANTS, v. FUAD HANNA, RESPONDENT.

No. 11852

October 29, 1981 635 P.2d 290

MOWBRAY and MANOUKIAN, JJ., dissented.

*Martin Becker,* and *Patrick R. Doyle,* Las Vegas, for Appellants.

*Leonard A. Wilson,* Las Vegas, for Respondent.

**OPINION**

By the Court, GUNDERSON, C. J.:

Appellants, Ronald and Mary Goldstein, sued respondent, Fuad Hanna, to compel specific performance of an option to purchase Hanna's condominium. The district court entered judgment in favor of Hanna. We reverse and remand.

On or about December 10, 1977, the parties entered into a lease relating to Hanna's condominium in Clark County, Nevada. The lease granted the Goldsteins an option to purchase the condominium, and declared "the option may be exercised at any time after December 1, 1977 and shall expire at midnight December 9, 1978 unless exercised prior thereto." Callahan Realty conducted all negotiations on behalf of respondent Hanna, and was designated in the agreement as his authorized agent. The Goldsteins dealt exclusively with Callahan Realty, both as tenants and prospective purchasers. They had no direct dealings with Hanna until after August 1978.

In the summer of 1978, the Goldsteins chose to exercise their option to purchase. They contemplated a purchase from Hanna, with a simultaneous sale from themselves to another purchaser. To effectuate this double sale, Callahan Realty established two escrows, both with closing dates of August 29, 1978. Shortly before the escrows were to close, however, the ultimate purchaser declined to perform.

Three days before their escrow with Hanna was due to close, the Goldsteins contacted Mr. Callahan, and specifically advised him that they intended to complete the purchase. They advised Callahan they would purchase the condominium themselves, rather than find another purchaser.[1] Callahan informed the

---

[1] The uncontroverted testimony of Ronald Goldstein reflects that he was prepared to fund the escrow himself when the ultimate purchaser declined to perform.

Goldsteins that they need not consummate the purchase by August 29, because their option would continue to be valid under the terms of the lease until December 9, 1978. To insure that respondent Hanna shared this understanding of the option terms, Mr. Goldstein requested Callahan call to Hanna, in his presence and confirm the agent's representations.

Callahan called Hanna and advised him that the ultimate purchaser would not close escrow as planned. Callahan also told Hanna that the Goldsteins' option to purchase would still be in effect until expiration of the lease term. Although Hanna testified at trial that he never authorized Callahan Realty to extend the escrow, the record indicates he never asserted that the option would not remain viable following termination of the pending escrow. On this issue, it appears he remained silent, and thus permitted the Goldsteins to rely on Callahan's representations. Callahan Realty, as Hanna's agent, thereafter accepted the Goldsteins' check for payments on the lease through October. Callahan Realty deposited the money in a trust account and issued a check to Hanna for the lease payments, less commission.

On August 31, Hanna notified the escrow holder to consider the escrow cancelled. On September 15, however, Hanna called the Goldsteins on at least two occasions and attempted to purchase their option rights in the property.[2] After the Goldsteins rejected Hanna's offer, they learned that Hanna purportedly had cancelled the escrow. Hanna then refused to participate in a second escrow initiated by the Goldsteins.

On these facts, the district court entered judgment for Hanna, which we think was erroneous. In our view, this case does not turn on whether Callahan correctly advised the Goldsteins concerning their contract with respondent Hanna. Nor need we decide whether Callahan had actual authority to alter the contract's terms. The doctrine of equitable estoppel clearly precludes Hanna from claiming that the Goldsteins' rights under the lease-option agreement expired on August 29, 1978.

According to § 8B(1) of the Restatement (Second) of Agency (1958), an equitable estoppel arises under the following circumstances:

> (1) A person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed

---

[2]Appellants' uncontradicted testimony is as follows:

Mr. Hanna offered to buy our interest out. Maybe I am not using the right phrase. He offered us money to leave the property. He said that he wanted the place for himself.

their positions because of their belief that the transaction was entered into by or for him, if

(a) he intentionally or carelessly caused such belief, or

(b) knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts.

*See also,* Gardner v. Pierce, 22 Nev. 146, 36 P. 782 (1894).

 ██

Where there is a duty to speak, silence can raise an estoppel quite as effectively as can words. A duty to speak arises when another is or may come under a misapprehension regarding the authority of the principal's agent. Under such circumstances, the principal is obligated to exercise due care, and to conduct himself as a reasonably prudent business person with normal regard for the interests of others. Restatement (Second) of Agency § 8B comment d. (1958). Thus, "a person remaining silent when he ought, in the exercise of good faith, to have spoken, will not be allowed to speak when he ought, in the exercise of good faith, remain silent." Gardner v. Pierce, 22 Nev. 146, 36 P. 782 (1894); *see also* Universal C. I. T. Credit Corporation v. Wagner Motor Company, 72 Nev. 337, 305 P.2d 363 (1956); Zunino v. Paramore, 83 Nev. 506, 435 P.2d 196 (1967). Similarly, silence or failure to repudiate an agent's representations can give rise to an inference of affirmation. According to § 94, comment a, of the Restatement (Second) Agency (1958):

Silence under such circumstances that, according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent, is evidence from which assent can be inferred. Such inference may be made although the purported principal had no knowledge that the other party would rely upon the supposed authority of the agent; his knowledge of such fact, however, coupled with his silence, would ordinarily justify an inference of assent by him. . . .

 ██

In the instant case, during his telephone conversation with Callahan, Hanna made no effort to assure that the Goldsteins were not misled or lulled by his agent's representations.[3]

---

[3]The uncontroverted testimony of Mr. Goldstein indicates:

A. I was concerned having, on Callahan's advice, used the last month's rent, in restoring this so as not to be in default of the agreement, and he called Mr. Hanna at that time, at my insistence, in my presence he phoned him, and advised him of the problem, that there

Hanna knew the Goldsteins might not hasten to complete the August escrow while assuming they still had several months to exercise the option. Consequently, Hanna's silence and acquiescence in his agent's representations manifestly caused the Goldsteins to do what they otherwise would not have done, *i.e.* to permit, at least arguably, a lapse of their valuable option rights.[4] "Persons ordinarily express dissent to acts done on their behalf which they have not authorized or of which they do not approve. . . ." Restatement (Second) of Agency § 43 comment a. (1958). The doctrine of equitable estoppel is properly invoked whenever "unconscionable injury would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract." Alpark Distributing Inc. v. Poole, 95 Nev. 605, 600 P.2d 229 (1979); Monarco v. Lo Greco, 35 Cal.2d 621, 220 P.2d 737 (Cal. 1950). In the case at bar, the detriment suffered by the Goldsteins involves the loss of the benefit of their bargain: the right to purchase the property for a specified sum.

Thus, we need not decide whether or not Callahan Realty would have had actual authority, acting alone, to extend the Goldsteins' right to exercise the option or to interpret the contract's meaning. In effect, Hanna imbued his agent, Callahan, with apparent authority to make the representations upon which the Goldsteins relied. "Apparent authority (when in excess of actual authority) proceeds on the theory of equitable estoppel; it is in effect an estoppel against the owner to deny agency when by his conduct he has clothed the agent with apparent authority to act." Ellis v. Nelson, 68 Nev. 410, 233 P.2d 1072 (1951); *see also,* Nevada National Bank v. Gold Star Meat Company, 89 Nev. 427, 514 P.2d 651 (1973); Tsouras v. Southwest Plumbing & Heating, 94 Nev. 748, 587 P.2d 1321 (1978).

---

would be a delay in the closing of the escrow and that—and he informed Mr. Hanna on the phone that—evidently he asked if this invalidated it, and he told him it did not, it was good until the end of November.

Q. What did Mr. Callahan indicate to you after the telephone conversation?

A. No problem. This is the basic phrase he used, no problem, we will go ahead and obtain a new buyer.

Q. Didn't Mr. Callahan also indicate to you he had full authority to make those representations?

A. Certainly. Yes.

[4]The record indicates that but for Hanna's silence the Goldsteins would have completed the escrow as scheduled. When Hanna informed the Goldsteins in mid-September 1978 that he did not intend to go through with an escrow with them, the Goldsteins promptly deposited with Western Title Company the necessary $82,000.00 to fulfill their part of the option agreement.

We therefore conclude that the doctrine of equitable estoppel precludes Hanna from claiming a forfeiture of the Goldsteins' option rights. The cause is reversed and remanded for further proceedings consistent with this opinion.[5]

BATJER and SPRINGER, JJ., concur.

MOWBRAY, J., dissenting:

Respectfully, I dissent.

As I understand the ruling, a landowner who offers his land for sale, enters into an escrow agreement for that purpose which is not completed because the buyer fails to perform in accordance with its terms may still be held liable thereafter by "his silence". In this case it is claimed that Callahan, a realtor, acting for the owner, verbally extended the escrow after its extinguishment. The owner testified that he never authorized such an extension. The trial court so found. But our ruling today concludes that the landowner did so, predicated on the theory of "estoppel by silence". I feel this pronouncement may endanger the orderly conduct of commercial transactions. For these reasons I dissent. The judgment of the district court should, in my opinion, be affirmed.

MANOUKIAN, J., dissenting:

I cannot agree with the majority opinion, because the record and law support an opposite result. Accordingly, I dissent.

In this appeal, appellants contend that the trial court erred in finding that respondent's agent did not have the authority to extend an escrow closing date, and alternatively, that absent such authority, respondent did not ratify the agent's unauthorized acts. The majority concludes that the doctrine of equitable estoppel prevents respondent Hanna from claiming that the Goldsteins' rights under the lease-option agreement expired on August 29, 1978. The majority's reliance on the law of estoppel in the context of this case is misplaced. It merely appears viable, because of the majority's omission of facts both material and relevant to the disposition of this appeal. Not only is the principle announced by the Court today without sound precedent, it is also a trap for unsuspecting prospective vendors.

On November 23, 1977, appellants-lessees and respondent-lessor entered into a "residential lease with option to purchase" for a residential unit (hereinafter referred to as Unit 21-E) in a development known as Regency Towers in Clark

---

[5]In accord with the parties' joint stipulation, rental payments of $4,966.87 paid by the Goldsteins to Hanna, pursuant to the district court's judgment, should be credited toward purchase of the condominium.

County. Appellants paid respondent $1,000 for the option to purchase the unit for $83,000, which option was exercisable anytime between December 10, 1977, and December 9, 1978. Callahan Realty, Inc., was named as respondent's agent regarding the lease.

On or about July 17, 1978, appellants exercised the option and the parties executed escrow instructions which set forth the terms and conditions of the sale. The closing date was August 29, 1978, and the escrow included a provision that time was of the essence. Callahan Realty, Inc., was named as the broker. The instructions did not authorize Callahan Realty, Inc., to extend the closing date of the escrow.

The record shows that Callahan, apparently without the knowledge of respondent, was coordinating a "double escrow" relative to Unit 21-E. The value of the unit was nearly twice the lease-option purchase price. On approximately August 26, appellants were informed that the third party buyer had withdrawn his offer to buy.

Shortly before the closing date of the escrow, appellants met with Gerald Callahan, president of Callahan Realty, Inc., to discuss the problems with escrow financing. While appellants were waiting, Callahan telephoned the respondent, Hanna. Hanna did not agree to extend the August 29 closing date, nor did he authorize Callahan to extend it and, in fact, indicated to Callahan that if appellants did not meet the escrow terms by then, the escrow would be cancelled.[1] Callahan, nevertheless, did not relate this information to appellants, and instead informed appellants that they could close at any time before the end of the option period.

Appellants did not comply with the escrow agreement by the August 29 deadline,[2] and on August 31, respondent sent a

[1]Although the majority opinion states that "the record indicates he [Hanna] never asserted that the option would not remain viable following termination of the pending escrow," the record, in fact, indicates that Hanna did exactly that. The majority states that "to insure that respondent Hanna shared this (Callahan's) understanding of the option terms, Mr. Goldstein requested Callahan call Hanna, in his presence, and confirm the agent's representations." Callahan's own testimony shows that Hanna objected to an extension of the escrow beyond the August 29, 1978, date. The majority's statement that Hanna apparently remained silent concerning the question of the viability of the option is clearly contradicted by the record.

[2]Irrespective of the majority opinion's reference to "[t]he uncontradicted testimony of Ronald Goldstein" concerning his claimed ability to fund the escrow, the record raises substantial doubt as to appellants' ability to fund the escrow by the August 29 closing date without participation of the third party buyer. While Ronald Goldstein claimed he had sufficient monies to fund the escrow when he first approached Callahan in June or July, he also testified: "I was so firmly convinced nothing would

notice of cancellation of escrow to the escrow company. Thereafter, appellants did not deposit the necessary funds until September 27, 1978. Appellants were subsequently unsuccessful in this action for specific performance and respondent successfully counterclaimed for unpaid rent. Appellants appeal from the adverse judgments.

It is the general rule that when an option is properly exercised, the option agreement is terminated and is converted into a bilateral contract for the purchase and sale of the property. Maloff v. B-Neva, Inc., 85 Nev. 471, 456 P.2d 438 (1969); 8 A. G. Thompson, Real Property § 4446 (1963). And when the option exercised is part of a lease-option agreement, the incidents of the lease agreement terminate as well, and the lessor-lessee relationship becomes that of vendor-vendee. Summa Corp. v. Richardson, 93 Nev. 228, 564 P.2d 181 (1977); Rosenthal v. Shapiro, 52 N.W.2d 859 (Mich. 1952). Accordingly, when appellants exercised the option in July, 1978, the option terminated and the lease agreement was converted into a contract for the purchase and sale of property.[3] As correctly noted by the trial judge, Callahan's assertions that the option could be exercised after the August 29 closing date were, therefore, erroneous legal conclusions.

Appellants reject application of the general rule discussed above, arguing first that Gerald Callahan, as agent for respondent, had apparent authority to renew the option or extend the escrow closing date beyond August 29, and that consequently, respondent's cancellation of the escrow was wrongful. As we stated in Tsouras v. Southwest Plumbing & Heating, 94 Nev. 748, 751, 587 P.2d 1321, 1323 (1978), quoting 2 F. Mechem on Agency §§ 725, 726 (2d ed. 1903):

It is indispensible to keep in mind here that, as against

---

go amiss [with the third party escrow] that we depleted some of these funds in business investments in Alaska, and then given two or three days' notice. . . ." Furthermore, when the Goldsteins funded the second escrow in late September, the money was deposited by Reames Food, Inc., a third party to the escrow, the title company was instructed not to inform the seller (Hanna) of the deposit, the funds deposited in the account could not be paid to the seller without written authorization from Reames Foods, Inc. and Reames could withdraw the funds from the escrow account at any time.

[3]The lease-option agreement itself unambiguously calls for the same result as the case authority cited above. The lease states:

This option may be exercised at any time after December 10, 1977, and shall expire at midnight December 9, 1978, unless exercised prior thereto. *Upon expiration Owner shall be released from all obligations hereunder and all of Tenants rights hereunder, legal or equitable, shall cease.* (Emphasis added.)

the principal, there can be reliance only upon what the principal himself has said or done, or at least said or done through some authorized agent. The acts of the agent in question can not be relied upon as alone enough to support an estoppel. If his acts are relied upon there must also be evidence of the principal's knowledge and acquiescence in them. . . .

Contrary to the majority view, appellants have failed to present any evidence of actions on the part of respondent which could be construed as clothing Callahan with the apparent authority to either extend the escrow or renew the option. *See* Tsouras v. Southwest Plumbing & Heating, *supra;* Ellis v. Nelson, 68 Nev. 410, 418-19, 233 P.2d 1072, 1076 (1951). *See also* Wilshire Insurance Co. v. State, 94 Nev. 546, 582 P.2d 372 (1978). Indeed, on cross-examination, Callahan testified that he had no authorization to extend the escrow, and that in the event appellants failed to timely comply, Hanna had instructed him to cancel the escrow.[4] Any representations that Callahan made regarding any extension of the escrow or regarding the option "were merely hearsay, and, however much the [Goldsteins] may have been lured into relying upon them, they did not affect the rights of the [seller]." Tsouras v. Southwest Plumbing & Heating, *supra,* at 751, 587 P.2d at 1323, quoting Schlitz Brewing Co. v. Grimmon, 28 Nev. 235, 249, 81 P. 43, 46 (1905). The determinations of the trial court are supported by substantial evidence, and I would not disturb them. Harris v. Shell Dev. Corp., 95 Nev. 348, 351, 594 P.2d 731, 733 (1979).

Appellants next contend that Hanna ratified Callahan's unauthorized actions by accepting subsequent rental payments, allowing the option to be exercised in a manner that was not specified in the agreement and by offering appellants money to vacate the premises before the lease expired.

We long ago held that when a principal deliberately ratifies the unauthorized acts of an agent, he will be bound thereby as fully as if the agent had been expressly authorized to do the act. Clarke v. Lyon County, 8 Nev. 181 (1873). A principal is only held to ratify the unauthorized act of an agent when he does so expressly, or, with full knowledge of the transaction, accepts or receives some advantage from it, or when he fails to repudiate

[4]Callahan also testified that customarily brokers are without the authority to extend an escrow. The legislative scheme supports this representation, providing that any "power over or concerning lands, or in any manner relating thereto [shall be in writing or subscribed to by the transferor] or by his lawful agent thereunto authorized in writing." NRS 111.205. Here, Callahan was unable to even produce a listing agreement.

it within a reasonable time after acquiring such knowledge. Edwards v. Carson Water Co., 21 Nev. 469, 34 P. 381 (1893). *See also* Goetz v. Security Industrial Bank, 508 P.2d 410 (Colo.App. 1973); Rakestraw v. Rodriques, 500 P.2d 1401 (Cal. 1972).

Here, there is no showing that respondent ratified Callahan's purported extension of the escrow period or that he even had knowledge of Callahan's unauthorized act; respondent's expressed intentions were to the contrary. The acts alleged by appellants to be a ratification of Callahan's conduct did not relate to the closing of escrow and cannot be deemed a renewal of the option or extension of the closing date.

On the authority of Tsouras v. Southwest Plumbing & Heating, *supra,* quoting 2 F. Mechem on Agency §§ 725, 726 (2d ed. 1903); Restatement (Second) of Agency, § 8B(1) (1958), I would reject as unmeritorious the claim of equitable estoppel. Hanna failed to take any action, express or implied, that could be construed as clothing Callahan with the necessary authority. It necessarily follows that appellants' reliance was inappropriate, as application of the doctrine of estoppel would require that Hanna know about and acquiesce to any assertion on which the Goldsteins purportedly relied. Tsouras v. Southwest Plumbing & Heating, *supra.*

I would affirm the judgments of the trial court.