Barry M. BLACKMAN, Plaintiff,

v.

HUSTLER MAGAZINE, INC.,
Defendant.

Civ. A. No. 76–2103.

United States District Court,
District of Columbia.

July 11, 1984.

Aidan D. Jones and Paul Martin Wolff, Washington, D.C., for plaintiff.

Angelo V. Arcadipane, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This matter is before the Court pursuant to plaintiff's amended and supplemental complaints seeking monetary solace, compensatory and punitive, for defendant's alleged copyright infringement, unfair competition and breach of contract. Tried to

the Court over several days, and bifurcated as to liability and damages, the evidence is supported by both in-court and deposition testimony, stipulations, documentation, and numerous pretrial and posttrial submissions of the parties.

Plaintiff, Barry M. Blackman, is a professional photographer who took nude photographs of Elizabeth Ray in September, 1972 at a time when Miss Ray was relatively unknown. Nineteen original color photographs and thirty-five original black and white photographs were created, reflecting originality by Blackman with respect to setting, composition, lighting, pose, expression and effect.[1] Miss Ray signed a model release giving the photographer all rights to use, publish and copyright the photographs.

Approximately four years later, in June, 1976, widespread, virtually unrelenting national publicity focused on the relationship of an United States Congressman and Elizabeth Ray.

Recognizing his potentially lucrative opportunity, Mr. Blackman published the photographs in June, 1976 with notice of his claim of copyright affixed thereto. Subsequent to this first publication, copies of each of these fifty-four photographs were filed with the United States Register of Copyrights, who thereupon issued Blackman the Certificate of Registration of a Claim to Copyright.

It is undisputed that Mr. Blackman has been the sole proprietor of the copyright in the photographs and the sole owner of all right, title and interest in them, save as to those rights he yielded to others, by license or other means.

Some of these photographs later appeared in three separate issues of the defendant publication: the September, 1976 issue of Hustler (nine photographs), "Best of Hustler # 2" (republication of the same nine photographs), and the July, 1979 issue of Hustler Magazine (republication of one photograph). S–59–62; PX 19–21. Al-though Hustler Magazine, Inc. ("Hustler"), through its officers and agents, knew that Blackman had the copyright to these photographs, there was no identification on the photographs of the plaintiff as the copyright owner. Mr. Blackman did not benefit from any financial compensation from Hustler, returning Hustler's uncashed $1,000 check and refusing an additional $15,000 which had been wired to his bank account.

The central dispute in this action revolves around the contractual defense asserted by Hustler which claims existence of a contract with Blackman through his agent, Tucker, for an authorized license to publish his Elizabeth Ray photographs in the defendant magazine.

During the period of June 11–13, 1976,[2] Blackman requested William L. Tucker, a stock picture broker, to assist him in obtaining potential purchasers of the rights to publish his Ray photographs; Tucker agreed to do so. (S–9) Blackman and Tucker had worked together months before on the sale and marketing of photographs unrelated to this action and had signed a "Photographer-Stock Picture Broker Form Agreement". As the Ray developments exploded hourly, they discussed the value of the Ray photographs and arranged for duplication of the transparencies, i.e., five to ten sets of transparencies and color photocopies of the slides. For purposes of illustrating the substance of the slides (although anything other than the original is rarely used for reproduction in publication), samples were made, to be available by mail or directly through Tucker, to the publications expressing interest in the photographs. Because of their anticipated value, Blackman intended that the originals of the pictures, along with the original model release, be maintained in Tucker's safe deposit box.

On June 14, plaintiff held a news conference in Tucker's office attended by representatives of the print media. He indicated

---

1. Stipulated Finding of Fact 5 (hereafter noted as S– ).

2. Unless otherwise noted, all references are to the year 1976.

he was the owner of photographs taken of Elizabeth Ray and that rights to publish them were available for sale. Mr. Blackman made a similar proclamation on June 15, over a local television channel. It was represented to the media only that Tucker was Blackman's agent and that prospective purchasers were to contact Mr. Tucker. No details were provided about Tucker's authority to conclude a final sales contract.

Other significant events transpired on June 15. On that morning Tucker entered into an agreement with George Barris, through Barris' agent, Thea Rosenbaum, for the foreign rights to the photographs. Ms. Rosenbaum was given duplicate Ray photographs. In foreign rights' transactions, it is not unusual to distribute duplicate photographs to the publisher. Tucker contends he acted under his original (March, 1976) agreement with Blackman, which provided him a certain commission and total authority to bind Blackman.

Challenged with inconsistent testimony at trial and at his deposition concerning the date of his knowledge that Tucker had contracted with Barris and whether Tucker did or did not have authority to finalize that contract without Blackman's express approval, Blackman explained that whenever he heard about that contract (be it the 15th of June, or June 23rd or 24th), he gave Tucker the "benefit of the doubt" that in the frenzied atmosphere of that time (and since the new agreement had not yet been formalized in writing) Tucker thought he was operating under the written agreement (Tr. 41.) While Blackman's explanation is plausible under the circumstances, it remains difficult to reconcile all actions which followed. Nonetheless, the Court does not conclude, as Hustler does, that the subsequent events so parallel the incident in the Hustler/Tucker "contract" that they are indicative of Blackman's compulsive strategy to get the best deal at any cost. On June 29, at Blackman's direction, Greensfelder sent a telegram to Barris stating that their "agreement" had been contracted without Blackman's approval and would be voided unless certain modifications were executed. Those changes,

which clarified murkey details, did not affect the agreed sharing of proceeds. The contract was fulfilled subsequently when each party received $600.00 for the sale of the foreign rights to these photographs.

After Tucker bound Blackman to the Barris agreement and after the televised press conference, Blackman and Tucker discussed terms of their proposed new agreement on June 15, recognizing that their previous arrangement had to be altered because of the "unique" nature of the Ray photographs. The essential negotiations would be conducted exclusively by Tucker, but Blackman had to give his approval to the negotiated agreement before it could be finalized.

Through testimony so convincing that even the defendant accepted his credibility (closing argument, at p. 25), Thomas M. Schatz corroborated the evidence that special arrangements for the Ray pictures were mutually agreed to by Tucker and Blackman during his presence, but not then reduced to final written form or signature. Tucker would be the sole negotiator as the best arrangement was sought; Tucker could not, however, sign a binding agreement with the purchasing publication without Blackman's approval. A rough draft reflecting this discussion was typed. The Blackman/Tucker agreement was not executed on the 15th since Blackman wanted to discuss its terms the next day with his attorney, Edward Greensfelder, Jr. The agreement was finally signed on June 21.

More excitement occurred on June 15. Albert Ahern, Jr., an attorney representing Elizabeth Ray, advised Blackman and Tucker not only that they were without rights to sell the photographs, but that litigation was imminent. As a result, Mr. Blackman retained Mr. Greensfelder to represent him in this matter.

Daniel R. Montgomery entered into the picture on that same eventful day. He worked in the field of show business management. Although he had never concluded a contract for anyone he represented, he had had previous contacts with Hust-

ler Magazine, Inc. and its publisher, Larry Flynt, concerning publication of photographs of "parallel" interest, unrelated to those of Elizabeth Ray. He sought to involve Hustler in the latter photographs and, accordingly, placed a long-distance telephone call to Larry Flynt. Flynt, who had been earlier unsuccessful in his direct application to Elizabeth Ray to have her pose for Hustler, was most interested in acquiring rights to publish Blackman's photographs; however, he wanted to first see them before committing Hustler to a contract of purchase. At Montgomery's behest, but with Flynt's express permission, Montgomery telephoned Tucker. He informed him that he was acting on behalf of Hustler and that Hustler was interested in rights to publish the Ray photographs. Tucker told Montgomery that he represented Blackman who was unavailable. Although Blackman left for New York only the next day, there is no doubt that Tucker was authorized to be sole negotiator and to secure the best deal. During the next hours, Montgomery and Tucker had several telephone conversations concerning the nature of the photographs, the model release and the sales price for the publication rights. Tucker asked for $25,000; Montgomery offered $16,000. Hustler's agent testified to his understanding that, while willing to pay $25,000, Flynt preferred to not exceed $20,000.[3] The $4,000 differential would represent Montgomery's commission, a commission to be realized only if the parties contracted for the right to the photographs.

Expressed through deposition read at trial, Montgomery's testimony reflects not only his knowledge that Tucker hoped to get more than $16,000 but that "I got the impression that what he was going to want to do was to delay and take bids [from the magazines]." (Tr. 76.)

Recognizing this was Tucker's first negotiation for these photographs and that his potential access to them might quickly evaporate in this climate, Montgomery "... thought, frankly, that my best way of se-

curing the rights was, again, to move as quickly as I could." (Tr. 76–77.) Emphasizing that "I wanted to move as quickly as I could," he again telephoned Flynt to spur action. When Flynt mentioned he would be back to Ohio the next week, Montgomery applied further pressure: "I told him that I felt we shouldn't delay, and he [Flynt] told me that if I had to I could arrange to come out to Las Vegas or have Tucker come out to Las Vegas or Blackman come out to Las Vegas, and we'd conclude the business out there." (Tr. 75.)

In light of other developments, Montgomery's testimony is unconvincing that "the end result, however, was that he [Tucker] agreed to sell the photographs for $16,000" before he departed for Las Vegas.

Tucker (and Blackman) were also appreciating the urgency of timing: although there was no timetable of offer and acceptance, the newsworthy moment was *now*, while "quite a few" magazines had expressed interest in the photographs. As Blackman testified: "the phone literally was ringing off the hook on the 15th, the day after the press conference." (Tr. 8.) Blackman and Tucker wanted to "test the waters" and secure the best financial transaction. Montgomery's eagerness to consummate an arrangement cannot be denied. It was he who arranged for Tucker to fly that night, at Hustler's expense, to Las Vegas where Flynt was attending a convention. Tucker was told to bring samples of the photographs (transparencies and the Xerox color copies) and a copy of the model release to discuss Hustler's possible purchase of the rights to publication. Hustler was to decide if the photographs were worthy of publication and when they could be published. Later events will show, however, that, initially, Flynt approached the matter more casually, as for example, he made no effort to ascertain his production schedule during the time Tucker was enroute to Las Vegas. Mr. Tucker met for fifteen minutes with Larry Flynt on the 15th after his arrival in Las Vegas. Flynt thereupon examined some of the sample

---

**3.** Flynt could not recall his price limitation but "thinks" it was $20,000.

photographs demonstrated to him. The men met again, as prearranged, for approximately one hour at breakfast the next morning. Negotiations between Flynt and Tucker continued thereafter in Flynt's hotel suite.

Tucker testified that he informed Flynt on approximately five occasions on June 16 that he lacked authority to conclude a binding contract and that Blackman had reserved the right of approval. Even though nothing was said to Flynt by Montgomery prior to June 16 concerning Tucker's authority to contract (in addition to negotiate), Flynt "just *assumed*, [that Tucker had authority to act on behalf of Blackman] because he had the photographs that [sic], the model release, that he was the agent." (Tr. 123.)

It is important to consider the scene on June 16 in Flynt's Las Vegas hotel suite where most of the relevant events occurred. Mr. Flynt, a sophisticated publisher, negotiated over a period of hours with Tucker, described by Jimmy Flynt as "... some guy [appeared] that looked like Paul Newman in "The Sting" and had some photographs of Liz Ray. Had on straw hat and the whole bit, suspenders." (Tr. 91–92.) Tucker admitted he was "out of my class." During the negotiations the caterers were in and out of the suite; the bartender was at the bar. Althea Flynt had emerged from the bedroom and gone to the balcony. Jimmy Flynt, among others, entered and exited the suite. Tucker swirled from telephone to telephone in the suite "like a cat on a hot tin roof", talking to competitor publications about the purchase of these photographs, trying to raise the sales figure  He left the suite to make further telephone calls. Despite this continuous activity with others, Flynt testified he considered Tucker's actions as only a "negotiation technique". (Tr. 119.) Still, Flynt "became very skeptical when Mr. Tucker kept talking to the other magazines, and I wanted to make sure that we had exclusivity." (Tr. 160.) More conversation ensued. Clauses were added to a draft. When Tucker told Flynt he would have to take the typed draft of the Hust-

ler/Tucker agreement to Blackman for his approval, Flynt became increasingly suspicious. He talked to Montgomery by telephone on more than one occasion that afternoon and evening, noting his extreme displeasure about Tucker's behavior and lack of authority to finalize the contract. Montgomery talked to Tucker who told him also that he lacked authority to complete the transaction. As Montgomery put it:

> So that was one problem that had been covered. He had told Flynt he couldn't make the deal, wanted to talk to Blackman, and now he just told me, again, yes, he wanted to make the deal. [Tr. 230.]

On clear notice that prudence was indicated in this business negotiation, Mr. Flynt observed, understandably, that

> I didn't know Mr. Blackman, and this guy Tucker, I didn't feel that he was playing with a full deck. I'm sorry. I mean, I just felt that he was the one who was not trustworthy. [Tr. 174.]
>
> . . . .
>
> I found the guy to be the most unpredictable person that I had ever seen. I felt that he was trying to sell the photographs to several different magazines at once.

While the negotiations continued and the contract was being typed, Tucker testified he once again told Flynt he lacked authority to conclude the agreement; Flynt used "harsh" language, complaining that he had thought the matter could be consummated in one day and "the whole process was taking so long since I had to go back to D.C. to get the photographer's approval." While Flynt denied this precise conversation, both Tucker and Flynt agreed that Flynt became so upset during that time of negotiations, that he told Tucker to "take your pictures and go" and "with the deal dissolved, I want to be reimbursed for the trip." (Tr. 179.) When Tucker offered to write a check for the amount, Flynt demanded cash; Tucker advised he did not have $1,000 cash with him. Tucker further contended, and Flynt denied, that Flynt

told others in the room to stand near the door while negotiations continued.

Prior to signing the document (PX–11) which defendant contends is the valid contract of publication rights, Tucker telephoned Greensfelder (Blackman's attorney). Greensfelder was aware that Tucker was in Las Vegas negotiating with Hustler's representatives since Blackman had spoken to him about the unsigned draft of the Blackman/Tucker contract. Mr. Greensfelder confirmed Tucker's testimony that Tucker told him he had notified Flynt that Blackman had the sole right to approve sale of the photographs.

Yet, despite his heightened suspicions and acknowledgment that "the deal was dissolved" at least at one time during the negotiations, Mr. Flynt maintained at trial that he was "absolutely certain" that Tucker had never advised him that Blackman had to approve the contract. This trial testimony is not persuasive. It is further noteworthy that, at his deposition taken years earlier, "when my memory was less impaired", Flynt was then uncertain as to whether Tucker had told him about the limited extent of his authority to contract.

What remains undisputed is that neither Flynt nor Montgomery attempted to communicate with Blackman during the negotiations to ascertain the reality of Tucker's authority.

At about the same time the June 16 negotiations were ongoing in Las Vegas, Albert Ahern (Elizabeth Ray's attorney) in Washington, D.C., sent a telegram at 11:52 a.m., EST, to Flynt's principal office in Ohio, noting his representation of Ray and asserting that Blackman and Tucker "have no authority to dispose of Ray's photograph [sic] Court action to be filed." This telegram was read over the telephone to

Flynt in Las Vegas no later than 3:56 p.m., EST. (S–39, 40)

Tucker claimed to feel intimidated by the cumulative circumstances: a negotiation of the most substantial deal he had encountered, acknowledgment he was "out of [his] class", threatened with demands of immediate repayment for a trip he was unable to reimburse, alone in Las Vegas in an atmosphere permeated by Hustler's proponents and uncertain as to whether Blackman/Tucker could sell the pictures for more. Aware he could not bind Blackman, he still could not afford to lose Hustler's bid for the pictures until he ascertained if greater compensation could be realized from another magazine. As a result of these circumstances, late into the day or early evening of June 16, William Tucker entered into the letter agreement with Flynt, on behalf of Hustler Magazine, Inc. Tucker insisted this agreement be binding only upon ratification by Blackman.

After signing the document, Flynt gave Tucker a $1,000 check made payable to "William Tucker and Barry Blackman." Tucker has consistently contended, and, at his deposition, Flynt concurred, that it was Tucker's idea that the check be made to both Blackman and him. Tucker maintains that he told Flynt, and Flynt understood, that the "deal was off" if Blackman disapproved the negotiation and refused to endorse the check. Flynt could not recall all of this discussion at trial. He remembered only making the check to both persons in order to "protect" the photographer since Tucker was acting so peculiarly. Tucker then left with Flynt the copies of the photographs he had shown him (ten black and white prints, eight duplicate transparencies and eight Xerox color copies).[4] The June

---

**4.** It will be recalled that Montgomery told Tucker to bring samples to Las Vegas. Both Blackman and Flynt testified that agents making final negotiations for their principals normally carry originals. Here, the reproductions were transparencies made on high quality duplicating stock. While a publisher would usually want originals, if the originals were unavailable, then, in Blackman's estimation, his transparencies were of good enough quality to be used for

publication. Flynt disagreed: "The quality of the photographs was pretty bad. At least some were duplicates. The contract I signed calls for the originals to be sent to me at a later date." (Tr. 169.) No magazine, according to Blackman, would make reproductions for publication purposes from Xerox color copies such as those transported by Tucker to Las Vegas for demonstration purposes. Mr. Flynt concurred: The

16 receipt for these photographs had noted thereon: "All copyrighted by photographer Barry. M. Blackman." After Flynt signed the receipt, he observed that Tucker had a few original transparencies in his briefcase and persuaded him to also leave those four original transparencies; an "Addendum" was added to the receipt. Tucker left Las Vegas near midnight and arrived in Washington, D.C. early on the 17th of June.

He telephoned Blackman in New York that morning, told him of the $1,000 check, that PX–11 had been signed and read all or parts of that letter to him. Blackman was upset and told Tucker to relay to Greensfelder what he had done.

Several hours later, Blackman sent a telegram to Hustler:

This is to confirm the advice of my agent William Tucker to you yesterday that I have reserved to myself personally the sole right to approve any sale of my photographs of Elizabeth Ray. I am considering your June 16, 1976 offer and will advise you in writing whether I accept it. However I am requiring full payment at the time of any such acceptance that I might subsequently give.

True to her threat, Elizabeth Ray filed an action on June 17 in the Superior Court of the District of Columbia to enjoin Blackman and Tucker from selling or distributing the photographs in issue. Although a temporary restraining order issued that evening, it dissolved by its own terms the next day due to Ray's failure to timely post the bond ordered by that court.

One week later, on June 24, Blackman and Tucker entered into an agreement with Cheri Magazine concerning the same Elizabeth Ray photographs. On that very day, Blackman sent a telegram to Hustler advising his rejection of "your offer on June 16, 1976 to purchase my photographs of Elizabeth Ray", that the $1,000 check was being returned by mail, and demanding return of his Ray photographs, transparencies, prints

and color separations. This communication was followed by a letter from Greensfelder to Larry Flynt reiterating the substance of Blackman's telegram and stating:

... Any further misappropriation or unauthorized use by you of these properties of Mr. Blackman will result in substantial damages to him for which Mr. Blackman intends to hold you responsible.

Hustler wired $15,000 to Blackman's bank account on June 25th. The bank refused the sum pursuant to Blackman's instruction.

Hustler did not return to Blackman the photographs left by Tucker with Flynt on June 16th. Nine photographs of Elizabeth Ray were published in its September 1976 issue which appeared in the market for sale during early August 1976. Republication of the same appeared in its Best of Hustler # 2 and republication of one photograph appeared in its July 1979 issue.

Hustler Magazine, Inc. knew, as of July 1, 1976, that Blackman had sold the photographs to Cheri Magazine which was going to publish them.

Pursuant to its June 24 agreement with Blackman and Tucker, Cheri Magazine published nine of the photographs in its September, 1976 issue which reached the market about the same time as did the September, 1976 issue of Hustler.

■ It is undisputed that all of the Ray photographs originally taken by Blackman and published in the Hustler issues were made and copied from transparencies, negatives of prints created by Blackman and obtained by Hustler from Tucker on June 16, 1976. (S–62.) Hustler published those photographs on three separate occasions, fully aware that Blackman owned the photographs. There is no doubt that Blackman preserved his copyright protection which was in existence at all relevant times of this cause.[5] As the asserted licensee,

---

Xerox color copies he obtained from Tucker were not publishable.

**5.** Publication of the photographs in 1976 and their republication in Best of Hustler # 2 are

governed by the Copyright Act of 1909, 17 U.S.C. §§ 1ff (1970) which was in effect through 1977. The copyright statute was completely revised in 1976 (Copyright Act of 1976, 17 U.S.C. §§ 101ff

Hustler bears, therefore, the burden to establish its right to publish by proving it held a valid copyright license as the result of an authorized and unconditional contract.

■ For the agent, Tucker, to bind his principal, Blackman, to any agreement with Flynt, Tucker must have had actual authority from Blackman to execute a final contract, or Blackman's actions must have reflected that Tucker had apparent authority.

■ A party, as Hustler, which argues that an agent (Tucker) had actual authority to enter into a contract binding his principal (Blackman), has the burden of proving the existence of that authority, or that the agent's act was authorized *nunc pro tunc* by ratification. *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 673 (D.C.App.1983). *See also, Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 548 (D.C.App.1981); *H.G. Smithy Co. v. Washington Medical Center*, 374 A.2d 891, 893 (D.C.App.1977); *Rustler's Steak House v. Environmental Associates, Inc.*, 327 A.2d 536, 539 (D.C.App.1974).

The evidence is uncontroverted and, indeed, corroborated, that on June 15, 1976, prior to Tucker's expected departure for Las Vegas to negotiate with Hustler for sale of the photographs, Tucker's authority was specifically limited to locating the best deal and exclusively negotiating its terms of sale. There can be no dispute from their testimony and that of an objective witness that Blackman and Tucker reached a clear understanding (to be later reduced to writing) as to their agreement.

Excited by his ownership over what had become his most valuable, and "unique", photographic creation, Blackman left no doubt of his exuberance; his insistence on control over a potential "gold mine" is understandable. Tucker fully understood his limitations: he would have no authority to enter into a binding contract; only Black-

man could approve (or disapprove) the proposed sale.

The indisputable evidence on this issue brought defendant's accusation of actual authority to a mere gasp when, in closing argument, Hustler's counsel realistically conceded the matter that Blackman and Tucker had restricted Tucker's authority before Tucker had even talked to Hustler's representatives.

It is, therefore, readily concluded that Tucker lacked actual authority to execute a contract binding on Blackman.

Even though actual authority to bind Blackman was absent, we must delve deeper and determine whether Blackman's actions vested apparent authority in his agent.

■ It is agreed that the law of Nevada controls this issue since Hustler alleges that Tucker's apparent authority was exercised and acted upon in that jurisdiction. The Supreme Court of Nevada has "repeatedly ruled" that

> Apparent authority (when in excess of actual authority) proceeds on the theory of equitable estoppel; it is in effect an estoppel against [the alleged principal] to deny agency when by his conduct he has clothed the agent with apparent authority to act. *Ellis v. Nelson*, 68 Nev. 410, 418, 233 P.2d 1072, 1076 (1951). *Accord, Rankin v. New England M. Co., supra; Mirodias v. S.P. Co.*, 38 Nev. 119, 145 P. 912 (1914); *Schlitz Brew. Co. v. Grimmon*, 28 Nev. 235, 81 P. 43 (1905); *Hacienda Gift S. v. L.V. Hacienda*, 76 Nev. 86, 349 P.2d 613 (1960); *Nevada Nat'l Bank v. Gold Star Meat Co.*, 89 Nev. 427, 514 P.2d 651 (1973). As the court explained in *Ellis*,

> 'It is indispensable to keep in mind here that, as against the principal, there can be reliance only upon what the principal himself has said or done, or at least said or done through some other and authorized agent. The acts

(1976), effective January 1, 1978, and governs republication of the photographs in the July, 1979 issue of Hustler. The standards relevant

here are the same in the original and successor Acts.

of the agent in question can not be relied upon as alone enough to support an estoppel. If his acts are relied upon there must also be evidence of the principal's knowledge and acquiescence in them.'

*Tsouras v. Southwest Plumbing & Heating,* 94 Nev. 748, 587 P.2d 1321, 1323 (1978).

■ Since the acts of the agent alone cannot support an estoppel to deny agency, what evidence is there of Blackman's actions—what did he say, what did he do—which might have cloaked Tucker with apparent authority.

The news conferences held in Tucker's office introduced him as Blackman's agent and as the person interested purchasers were to contact, but, significantly, there was no representation about the scope of Tucker's authority to bind his principal to a final contract. Indeed, Flynt did not hear of the Ray photographs from those conferences and therefore could not have been misled by anything said or done there. He did not know about Tucker until Montgomery told him of his existence. Flynt's *assumption* about Tucker's apparent authority could not have sprung from reliance on the news conferences. Montgomery did not tell Flynt that Tucker had final authority. Tucker vehemently contended he not only did not demonstrate apparent authority but time and again affirmatively and directly denied his ability to conclude the transaction without Blackman's approval.

Although expert testimony was absent concerning the "custom of the trade" in this regard, it was unnecessary to prove the point. Examination of the testimony of the actors in this case is enlightening. Mr. Flynt stated that he "just assumed" Tucker was the agent because he had the photographs and the model release, matters that in his experience were received by the purchaser from the seller. Although he claims reliance on this, it is difficult to perceive why this experienced publisher, confronted with duplicates he termed "pretty bad", and Xerox copies which were unpublishable, would conclude that their mere posses-

sion by Tucker conveyed apparent authority to contract rather than just a demonstration of samples in a negotiation conference. It was Flynt, we recall, who recognized the inadequacy of the samples and demanded that originals be forwarded to him.

Tucker could affirm only his personal experience as having authority (as an agent) to generally sell without approval of his photographer-principal, but he could not testify as to the custom of the trade in the stream of commerce.

Blackman's experiences were most illuminating and most persuasive: Although originals are often sent through the agent to promptly seal the agreement, this is not always so. On only one occasion, of the thousands of transactions in which he has sold photography, did his customer contend that possession of duplicates and unpublishable copies conveyed authority to publish. That occasion was the encounter with Hustler.

■ Blackman's only acts here, then, were to give his agent copies of the photographs and model release to permit Tucker to negotiate the "best deal" possible with any interested buyer. Blackman's deeds did not provide the appearance of authority in Tucker to consummate an agreement. On the contrary. Had Tucker had the authority to finalize the contract for Blackman, and had that contract been fully negotiated before his departure for Las Vegas, he would surely have brought with him, on that specific trip, the *original* photographs for display and tender to Hustler, not the mere duplicates and unpublishable Xerox copies. That Flynt knew he had only duplicates is borne out by testimony and documentation. See the "Addendum" to the receipt for the few original photographs and the "agreement" itself (PX–11) which requires originals to be sent Flynt at a later time.

Accordingly, the defendant has not discharged its burden of proving that, under the trade's custom or under Blackman's acts, Tucker had apparent authority.

■ Hustler cannot bind Blackman on the basis of its reliance on the apparent authority of an agent if it knew, should have known, or had constructive knowledge that Tucker lacked authority. Of course, had Hustler known that actual authority was lacking, then there could not be apparent authority. Its reliance on apparent authority "must have been a reasonable one, consistent with the exercise of reasonable prudence." *Tsouras v. Southwest Plumbing & Heating*, 587 P.2d at 1323. *See also, Ellis v. Nelson*, 233 P.2d at 1076:

> ... in any case, the reliance must have been a reasonable one, consistent with the exercise of reasonable prudence, and the party who claims reliance must not have closed his eyes to warning or inconsistent circumstances. Authority is not 'apparent' simply because the party claiming has acted upon his conclusions. It is not 'apparent,' in contemplation of law, simply because it looked so to him. It is not a situation where one may read while he runs. It is only where a person of ordinary prudence, conversant with business usages and the nature of the particular business, acting in good faith, and giving heed not only to opposing inferences but also to all restrictions which are brought to his notice, would reasonably rely, that a case is presented within the operation of the rule. If the inferences against the existence of the authority are just as reasonable as those in favor of it, there can be no reliance within this rule.[6]

Undeniably, Hustler had notice of Tucker's limited authority. Tucker's testimony is persuasive, despite its colorful and abrasive delivery. He told Flynt of Blackman's reservation of approval on five occasions: (1) after their breakfast on June 16, (2) in the hotel basement after Flynt gave the typist notes to be typed and after Tucker had called Greensfelder, (3) in the hotel suite when, in Flynt's hearing range, Tucker told Montgomery of Blackman's right to approval, (4) after a draft contract had been typed and (5) just before Tucker and Flynt signed the contract. Even were Tucker's statements suspect (and they are not), credible corroboration exists in the record, which independently supports those statements: Greensfelder's testimony, or the making of the check to both Blackman and Tucker, or, most significantly in the context of this matter, Montgomery's testimony. That testimony of his agent was confirmed by Flynt. It was Montgomery who responded to Flynt's outrage that Blackman's approval of any offer was required and it was Flynt who confirmed at trial that he told Montgomery about Tucker's expressed lack of authority and his concern about that situation.

The testimony is wholly persuasive that when the typed contract was produced for signature, Flynt was again warned by Tucker about the limits on his authority. As Flynt concedes, he was so angered that the contract could not be promptly finalized that he demanded immediate cash reimbursement from Tucker for the expenses, a demand to which Tucker could not comply.

It must be observed here that in 1978 Larry Flynt was the victim of an assassination attempt. As a result, he was not only paralyzed physically, encountering serious and lingering problems with drugs and medications (the reason for the delayed trial), but also had obvious and continued difficulty focusing on questions put to him. He admitted this frailty at his deposition; at trial, the Court and counsel observed his pronounced hesitation and groping for thought. The memory gaps were of such measure that everyone at trial, including Mr. Flynt, knew his memory was severely

---

6. The law of the District of Columbia is similar. The doctrine of apparent authority, commented *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666 n. 7 (D.C.App.1983), "focuses upon the *third party's* understanding of the agent's authority: whether the third party reasonably relied upon conduct of the principal (including acquiescence) or conduct of the agent for which the principal is responsible." W. Seavey, Agency, §§ 8, 18 at 13, 33. In accord, *Feltman v. Sarbov*, 366 A.2d 137, 139–40 (D.C.App.1976); *Insurance Management of Washington, Inc. v. Eno & Howard Plumbing Corp.*, 348 A.2d 310, 312 (D.C.App.1975).

impaired; those present at both occasions recognized the impairment was more aggravated at trial than at his earlier deposition. In closing argument, Hustler's counsel, who struggled to make the best of a tragic circumstance, had to concede the difficulties for Mr. Flynt personally and for the problems Hustler experienced accordingly in presenting proof at this trial. He lamented that "many times he [Flynt] made the statement, 'I do not remember, I don't recall'" (p. 36). "I wish Mr. Flynt could have told us more. He can't" (p. 33); "His recollection of specific items is not good and it's obvious the drugs do affect him" (p. 36).

Viewing this more charitably than plaintiff's counsel, who confronted Flynt's "on-again, off-again" recollections as "selective memory", the Court considers Mr. Flynt's impairment of memory as real, tragic, substantial, and overwhelmingly destructive of persuasion. It can be given only minimal weight. Although Mr. Tucker is characterized by plaintiff's counsel as "quirky" (Plaintiff's Post Trial Brief as to Liability, at 15), and could also be described as "skittish", his testimony has nonetheless been essentially consistent. It has also been corroborated by other credible evidence as to most of the relevant matters. It is not only credible; it is convincing.

The evidence then is far beyond even reasoned doubt that Hustler, through Flynt, was on notice that Blackman's approval was required before an agreement could be binding. Under the law of Nevada, there can be no viable assertion by Hustler that Tucker possessed apparent authority when the defendant knew that actual authority was absent.

Once warned about Tucker's limited authority, Hustler then failed to exercise due diligence to "giv[e] heed not only to opposing inferences but also to all restrictions which are brought to [its] notice." *Ellis v. Nelson*, 233 P.2d at 1076. It was Flynt, after all, who forcibly challenged Tucker's credibility as he was negotiating with him, "... I just felt that he was the one who was not trustworthy." (Tr. 174.) Had

Flynt been as "suspicious" of Tucker as he claimed to be, particularly when he learned, as he testified, that Tucker was telling Montgomery inconsistent versions of his authority to contract, then Hustler, acting through Flynt, was not free to close its eyes to these warnings and dismiss Tucker's statements, as "mere puffery and a negotiating tactic."

Even were we to accept Flynt's argument that he only had this one direct notice, at the very least, this alone, coupled with indirect rumblings of doubt festering within Flynt, would be more than sufficient to raise concerns. Those concerns imposed upon Flynt the duty of utilizing reasonable prudence and good faith in determining the extent of Tucker's authority. Only one person could definitively resolve the inquiry, Barry Blackman, the principal, known by name and recognized as the photographer and copyright owner. Nonetheless, inexplicably, neither Montgomery (Flynt's agent) nor Flynt made so much as an attempt to telephone Blackman to ascertain the truth of the matter. One cannot choose to blithely ignore warnings, utterly fail to exercise due diligence, and then "assume" without reasonable basis that authority existed, claiming later it has been the innocent victim of another's chicanery.

When Flynt insisted on signing the "contract" after notice of Tucker's limited authority, he gambled on Blackman's subsequent acquiescence in the deed. As this litigation has shown, that gamble was markedly unsuccessful.

It cannot be overlooked that even had Tucker falsely represented his authority to Hustler, Blackman would be bound by his representations only if he consented or acquiesced to the representations. *Orbit Station, Inc. v. Curtis*, 678 P.2d 1153 (Nev.1984), citing *Myers v. Jones*, 657 P.2d 1163 (Nev.1983); *Goldstein v. Hanna*, 97 Nev. 559, 635 P.2d 290 (1981); *Wilshire Insurance Co. v. State*, 94 Nev. 546, 582 P.2d 372 (1978). When a person does not have actual authority to act, his representation that he does, is insufficient by itself, to establish that authorization.

*Tsouras v. Southwest Plumbing & Heating,* 587 P.2d 1321.

Notwithstanding defendant's contention, there is no credible evidence that Blackman, or Greensfelder, either ratified the June 16 document or even suggested ratification of the Tucker/Flynt document would promptly follow dissolution of the temporary restraining order briefly secured by Elizabeth Ray.

■ Further, to rely on the doctrine of apparent authority, it must be proved that a party relied to its detriment on the appearance that an agent was authorized to act. On June 17, less than 24 hours after the document was signed, Blackman repudiated it as a contract. Flynt testified that because of imminent production, Hustler sent the photographs to Los Angeles during those hours. Yet, the record is silent as to when they were received in Los Angeles and as to what was done with them in the less than 24-hour period before Flynt was concededly apprised, had he not been before, that Tucker lacked authority to act conclusively to bind Blackman. (S–50.) Flynt not only was unable to recall the production deadline but had made no effort to ascertain its imminence while Tucker was on his way to Las Vegas.

■ Flynt asserted that a press release was prepared on June 16 about Hustler's acquisition of the rights to the photographs; he testified that a Las Vegas newspaper published such an article the next day. Yet, even were we to disregard Flynt's gamble here (that Blackman would give his approval to the "agreement"), and even were we to accept Flynt's protestations that he did not know Tucker was without authority, there is no evidence of what either the press release or news article said and how that injuriously created embarrassment and loss of credibility to Hustler, as contended. The record is devoid of anything concrete. Nothing exists save sheer speculation as whether there was damage and the extent of that injury, if any.

■ Blackman offered parol evidence, appropriate here, to prove the existence of an oral condition precedent to the written agreement in issue. Because the condition precedent was not fulfilled, no valid and binding agreement ever came into existence. Under the law of both Nevada and the District of Columbia, an oral condition precedent to a written contract may be established by parol evidence. *See Mark Keshishian & Sons, Inc. v. Washington Square, Inc.,* 414 A.2d 834 (D.C.App.1980), citing *Luther Williams, Jr., Inc. v. Johnson,* 229 A.2d 163, 164 (D.C.App.1967):

> [i]n this jurisdiction ... it is well settled that a written contract may be conditioned on an oral agreement that the contract shall not become binding until some condition precedent resting in parol shall have been performed.

■ Oral evidence can show that a written agreement never became effective, 4 S. Williston, Contracts § 634 (3d ed. Jaeger, 1961), where a condition precedent remains unsatisfied.

The choice of law here is Nevada which rules similarly. *See Child v. Miller,* 74 Nev. 223, 327 P.2d 342 (1958), expressing the general view that since the parol evidence rule presupposes a valid and binding agreement, parol evidence is admissible which goes to the very *existence* of a contract, not merely the contradiction or variance of the written instrument, and tends to show that no valid and effective contract was ever formed.

> [P]arol evidence is admissible to show conditions precedent which relate to the delivery or taking effect of an instrument. Such evidence does not constitute an oral contradiction or variation of the written instrument but goes to the very existence of the contract and tends to show that no valid and effective contract ever existed.

*Id.* at 343–44. *See also Daly v. Del E. Webb Corp.,* 96 Nev. 359, 609 P.2d 319, 320 (1980); *Western National Insurance Co. v. Trent,* 69 Nev. 239, 247 P.2d 208 (1952).

■ In this case, the plaintiff has established by an abundance of evidence, well

beyond a preponderance, that there was an oral condition precedent to the existence of any binding contract, that is, that Blackman approve the terms negotiated by his agent Tucker. The contract would become binding only upon fulfillment of that condition. On June 17, less than one day after Flynt and Tucker signed a purported agreement, Blackman reiterated by telegram his reservation of approval of any contract. No binding obligation between Hustler and Blackman ever came into being. The document executed on June 16, 1976, therefore, had only the legal effect of an offer from Hustler to Blackman. *See,* 1 A. Corbin, *Contracts,* § 88 at 375–76 (1963):

> When one party solicits and receives an order or other expression of agreement from another, clearly specifying that there is to be no contract until ratification or assent by some officer or representative of the solicitor, the solicitation is not itself an offer; it is a request for an offer. [Footnote omitted.] The order that is given upon such a request is an offer, not an acceptance.

Blackman told Hustler he was considering its offer; he chose to reject this offer one week later.

■ In sum, in June 1976, Barry M. Blackman secured federal statutory copyright protection for his photographs of Elizabeth Ray which entitled him to have the exclusive right to print, reprint, publish, copy and vend the photographs for 28 years. Having registered his copyrights in the photographs with the United States Register of Copyrights, he is entitled to maintain an action for infringement of those statutory copyrights. 17 U.S.C. §§ 13, 101 (1976). As detailed herein, the June 16, 1976 negotiations between William Tucker (Blackman's agent) and Larry Flynt (on behalf of Hustler) did not result in a final agreement but resulted only in an offer by Hustler to purchase rights to publish Blackman's photographs. Blackman rejected Hustler's offer and twice requested that Hustler return the copies of his photographs which Hustler had in its possession. Hustler refused to do so.

Thereafter, with reason to believe its acts constituted infringement of copyrights, and in the absence of a license to do so, fully cognizant of plaintiff's rejection of its offer, Hustler wilfully published Blackman's copyrighted photographs on three occasions. The first occasion occurred months after Blackman disavowed any contract. In a brash adventure with destiny, the second and third republications occurred after litigation had commenced.

■ The defendant, Hustler Magazine, Inc. has clearly infringed plaintiff's copyrights in the absence of an unconditional contract and in noticed absence of the agent's authority to bind Blackman.

On June 24, 1976 Cheri had entered into an agreement to purchase the rights to the Ray photographs for $30,000, of which $20,000 was then tendered. The balance of $10,000 would be "immediately paid" if Hustler magazine or any magazine "under the control of Larry Flynt", did not publish any of those photographs prior to Cheri's publication, PX–17.

■ When Hustler wrongfully appropriated Blackman's photographs, it further failed to identify Blackman as the creator photographer and placed its magazines containing those unlicensed photographs on the market in competition with Cheri Magazine to which Blackman had licensed exclusive domestic rights to publish his photographs, thereby reducing the license value of the photographs. In addition to Hustler's wrongdoing as an infringer of Blackman's copyrights, Hustler's misappropriation and publication of the photographs for its own commercial advantage in competition with Blackman, constitutes unfair competition for which Blackman is entitled to recover damages. The law of unfair competition is not only a bulwark against this representation; it is the protector, also, against misappropriation. *Truck Equipment Service Co. v. Fruehauf Corp.,* 536

F.2d 1210, 1220 (8th Cir.), *cert. denied,* 426 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). *See also, Ray v. Proxmire,* 581 F.2d 998 (D.C.Cir.), *cert. denied,* 439 U.S. 933, 99 S.Ct. 326, 58 L.Ed.2d 329 (1978), where the Circuit likened the tort of unfair competition to a "somewhat anomalous creature", 581 F.2d at 1002; it included, among the scope of limited activities, "passing off one's goods as those of another."

When Hustler elected to publish Blackman's photographs, it infringed Blackman's copyrights and acted in unfair competition. It therefore made a wilful, economic decision for which it must now be held accountable. Hustler is, therefore, liable to Blackman for the damages and penalties, and may be additionally held liable to the prevailing party for costs and attorney's fees.[7]

As explicated above, Hustler proceeded to publish these photographs in the face of immediate and expressed notice (heard but ignored) that authority was lacking to seal a binding contract; it continued its illegal pursuit to publication in the illumination of further notice by Blackman on June 17, within less than 24 hours of Tucker's signature. Blackman and his attorney gave yet further rejection of the "agreement" on June 24 and 25, demanding return of the photographs and prohibiting use of these photographs. Hustler's publications of these photographs were not inadvertent or accidental; they did not result from a misunderstanding. As Hustler acted in conscious disregard of Blackman's rights, its actions were deliberate, intentional, malicious and wanton. Instances as these may well justify the award of punitive damages to plaintiff to punish the defendant and deter it as well as others from engaging in the same or similar acts.[8]

While punitive damages are not favored, "... the rule is well-established in this jurisdiction that a jury may assess punitive damages in the proper case." *Wanis v. Zwennes,* 364 A.2d 1193, 1195 (D.C.App. 1976). In accord, *Knippen v. Ford Motor Co.,* 546 F.2d 993, 1002–03 (D.C.Cir.1976); *Nader v. Allegheny Airlines, Inc.,* 512 F.2d 527, 549–50 (D.C.Cir.1975), *rev'd on other grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). *See also, Bay General Indus., Inc. v. Johnson,* 418 A.2d 1050, 1058 (1980), quoting *Riggs National Bank v. Price,* 359 A.2d 25, 28 (D.C.App. 1976). *See generally,* W. Prosser, *supra* n. 7, at 9–10; *Wager v. Pro,* 603 F.2d 1005, 1011 (D.C.Cir.1979).

For all the above reasons, judgment shall be entered in favor of the plaintiff, Barry M. Blackman, on the issue of liability, and against the defendant, Hustler Magazine, Inc. The cause having been bifurcated, the issue of damages shall be resolved at a subsequent hearing, noted in the accompanying Order.

Since Hustler's counterclaim is predicated entirely on the existence of a valid and binding contract, which the Court has found never existed, the counterclaim lacks merit and must fail. Judgment shall be entered thereon in favor of plaintiff.

IT IS SO ORDERED.

---

**7.** The Copyright Act of 1909 which governs publication of the photographs in 1976 and their republication in The Best of Hustler #2, provides that full costs shall be allowed, 17 U.S.C. § 116. The Copyright Act of 1976, which governs republication in the July, 1979 issue of Hustler, states that "... the court in its discretion may allow the recovery of full costs by or against any party ...," 17 U.S.C. § 505. Each statute gives the court discretion to award the prevailing party a reasonable attorney's fee.

**8.** "(1) Punitive damages are damages, other than compensatory or minimal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future. (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant." Restatement (Second) of Torts § 908 (1979).

ORDER GRANTING PLAINTIFF'S MO-
TION TO STRIKE SPECIFIED EX-
CERPTS OF DEPOSITION TESTIMO-
NY

During trial in this cause, defendant read into evidence deposition testimony of two witnesses unavailable to testify in person: Daniel R. Montgomery (Hustler's agent for the transaction in issue) and David S. Bloomfield (Hustler's attorney). Plaintiff's counsel raised certain objections. As a result, the Court either admitted the protested testimony provisionally or withheld its ruling until consideration of supplemental papers which have been filed post-trial. The Court agrees with the essential bases of plaintiff's memorandum. The protested portions of the testimony are inadmissible under the Federal Rules of Evidence, in particular Rules 802, 804(b)(1) and 801(d)(1).

Defendant concedes that Mr. Montgomery's engineering education and his experience as a part-time agent for only one client in show business, could not have qualified him as an expert on the role of agents in the general trade of show business and, in particular, publishing industries. Accordingly, that portion of his testimony which reflects an expert's opinion in this area is inadmissible and is stricken. His testimony, however, which reflects his individual and personal experience, albeit limited, is admissible for whatever weight the Court deems appropriate to give. It is therefore,

ORDERED, this 10th day of July, 1984, that the following deposition testimony, read into the record during trial, be and it hereby is stricken from the record: (i) Deposition of Daniel R. Montgomery, June 6, 1979, page 11, lines 9–24; page 12, lines 12–13; page 21, lines 7–18; page 21, line 24 through page 22, line 4; page 25, line 23 through page 27, line 20; page 28, lines 4–18; page 58, lines 4–18; and (ii) Deposition of David S. Bloomfield, January 24, 1979, page 31, line 14 through page 33, line 3; page 35, line 21 through page 36, line 5; page 38, line 22 through page 39, line 16; and page 42, line 25 through page 44, line 2.